UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 06-■--22311-CIV-SEITZ/MCALILEY

LOURDES MURO, an individual,

     Plaintiff,

-vs-

HERMANOS AUTO WHOLESALERS, INC.,
a Florida corporation, doing business as "The
Car Shack."

     Defendant.



_____

DOWNTOWN REPORTING
337 East Las Olas Boulevard
Fort Lauderdale, Florida
July 10, 2007
1:30 p.m.- 3:15 p.m.

- - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION

OF

ERNESTO SANCHEZ

- - - - - - - - - - - - - - - - - - - - - - - -

Muro v. Hermanos Auto                    7/10/07                        Ernesto Sanchez

2

```
 1   APPEARANCES:

 2        On behalf of the Plaintiff:
            ROBERT W. MURPHY, ESQUIRE
 3          1212 Southeast 2nd Avenue
            Fort Lauderdale, Florida  33316

 4

 5        On behalf of the Defendant:
            AARON R. SOBEL, ESQUIRE
 6          2020 Northeast 163rd Street
            Suite 300
 7          North Miami Beach, Florida  33162

 8                        -   -   -

 9

10        PLAINTIFF'S EXHIBITS FOR IDENTIFICATION

11                     1       P.   15

12                     2            23

13                     3            25

14                     4            28

15                     5            31

16                     6            32

17                     7            49

18                     8            52

19

20

21

22

23

24

25
```

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

3

```
 1                    P R O C E E D I N G S

 2                          -  -  -

 3              Deposition taken before MARLA S. ARROW,

 4    Professional Shorthand Reporter and Notary Public in

 5    and for the State of Florida at Large, in the above

 6    cause.

 7                       -  -  -

 8    Thereupon,

 9                    (ERNESTO SANCHEZ)

10    Having been first duly sworn or affirmed, was examined and

11    testified as follows:

12                    DIRECT EXAMINATION

13    BY MR. MURPHY:

14         Q.    Sir, please state your full name.

15         A.    Ernesto Sanchez.

16         Q.    Have you ever had your deposition taken

17    before?

18         A.    Yes.

19         Q.    For your recollection, also, for the record,

20    if I ask you a question and you do not understand it,

21    ask me to repeat myself.  When I use an acronym,

22    slang, words not of common usage, if you answer a

23    question, I'm going to assume you answered it fully

24    adequately and to the best of your knowledge and

25    ability.  All right?
```

4

```
 1        A.    Okay.

 2        Q.    You mentioned you had a deposition before.

 3  How many times?

 4        A.    Once.

 5        Q.    In what type of case?

 6        A.    Don't remember.

 7        Q.    Was it a case involving something to do with

 8  vehicles, such as selling them, financing vehicles?

 9        A.    Yes.

10        Q.    How long ago was it?

11        A.    I do not remember.

12        Q.    Was it more than five years ago or less than

13  five years ago?

14        A.    Less than five years ago.

15        Q.    Do you remember what the case was about?

16        A.    No, I don't.

17        Q.    Was that case resolved?

18        A.    Yes.

19        Q.    Aside from that it was a deposition?

20        A.    Excuse me?

21        Q.    It was a deposition?

22        A.    Yes.

23        Q.    Do you remember the name of the attorney on

24  the other side?

25        A.    No, I don't.
```

```
 1        Q.    That lawsuit involved the Car Shack,
 2   correct?
 3        A.    Correct.
 4        Q.    What lawyer represented the Car Shack?
 5        A.    Mr. Sobel.
 6        Q.    What is your position with the Car Shack?
 7        A.    I'm the president.
 8        Q.    For purposes of this deposition, I'm going
 9   to refer to Hermanos Auto Wholesalers, Incorporated as
10   the Car Shack.  Understood?
11        A.    Yes.
12        Q.    The Car Shack is a fictitious name for that
13   corporation, correct?
14        A.    Correct.
15        Q.    How long has the Car Shack been in business?
16        A.    Since 1990.
17        Q.    How many lawsuits have been filed against
18   the Car Shack?
19        A.    Do not remember exactly.
20        Q.    Would it be more than five or less than
21   five?
22        A.    Less than five.
23        Q.    More than two?
24        A.    Two would be a correct number.
25        Q.    This particular case involving my client
```

1  Lourdes Muro and the other case that you can't

2  remember?

3         A.    Correct.

4         Q.    How long have you been in the car business?

5         A.    Since 1990.

6         Q.    Before getting into the car business, what

7  did you do?

8         A.    Automotive transport.

9         Q.    What do you mean by automotive transport?

10        A.    Transporting vehicles.

11        Q.    Using a tractor trailer?

12        A.    Correct.

13        Q.    Are there any other officers of the Car

14  Shack other than yourself?

15        A.    No, there aren't.  I'm the only one.

16        Q.    Who are the shareholders?

17        A.    Just me.

18        Q.    Are there any other directors?

19        A.    No.

20        Q.    Does the Car Shack have a license to be a

21  retail installment seller?

22        A.    Yes, we do.

23        Q.    How long has it had a license to be a retail

24  installment seller?

25        A.    Since 1991.

1      Q.    Do you know what dealer school is?

2      A.    Yes, we do.

3      Q.    What is dealer school?

4      A.    It's a school that you have to take in order

5   for DMV to issue a dealer's license.

6      Q.    Did you attend dealer school?

7      A.    Yes, I did.

8      Q.    When did you attend dealer school?

9      A.    Back in 1990.

10      Q.    Have you attended any sort of courses or

11   seminars?

12      A.    Refreshment, yes.

13            MR. SOBEL:  Let him finish the question.

14      A.    On line, yes.

15      Q.    How often do you do that?

16      A.    We're required to do so every two

17   years,beginning a year ago.

18      Q.    You've already attended yours, correct?

19      A.    Yes, I did.

20      Q.    How long did the on line course take?

21      A.    It's eight hours only.

22      Q.    Did that correspondence discuss things such

23   as compliance with federal and state laws concerning

24   financing of vehicles?

25      A.    Little bit, yes.

1      Q.    What little bit did they talk about?

2      A.    **Jesus, I don't remember.**

3      Q.    Why can't you remember?

4      A.    **It's been almost two years.  I'm 47 years**

5  **old.**

6      Q.    Do you know who Lourdes Muro is?

7      A.    **Yes.**

8      Q.    How do you know her?

9      A.    **She's your client.**

10     Q.    You used the expression client.  Does that

11  mean customer?

12           MR. SOBEL:  He said your client.

13     Q.    I'm sorry, my client.  I'm sorry, my

14  mistake.  Was she also a customer of the Car Shack?

15     A.    **Correct.**

16     Q.    When did she first come to the Car Shack?

17     A.    **2005.**

18     Q.    Do you remember the circumstances of her

19  coming to see you -- strike that.

20     A.    **Actually, excuse me, let me go back.  She**

21  **came in 2005, her son is the one that came in in**

22  **September 2005.**

23     Q.    Do you remember her son's name?

24     A.    **Jonathan Gomez.**

25     Q.    Do you know how old Mr. Gomez is?

1      A.    Pardon me?

2      Q.    Do you know how old he is?

3      A.    No, I don't.

4      Q.    Had you met with either Ms. Muro or her son

5   Jonathan Gomez before they first came in

6   September 2005?

7      A.    Before then?

8      Q.    Yes.

9      A.    No, I didn't.

10      Q.    Do you know how they came to Car Shack in

11   terms of what led them there?

12      A.    I do not know.

13      Q.    Do you know if they had a referral?

14      A.    No, I don't.

15      Q.    Do you know whether or not they mentioned to

16   you that they had seen the vehicle at the front of the

17   store at the Car Shack that they liked?

18      A.    I wouldn't remember.

19      Q.    What is your recollection concerning why

20   they came to the Car Shack?

21      A.    They came or Mr. Gomez, came to the

22   dealership to try to buy a vehicle.

23      Q.    Did he come by himself at first?

24      A.    By himself, yes.

25      Q.    What do you recall about that initial visit

```
 1   to the dealership by Jonathan Gomez?

 2        A.   Not much, no.

 3        Q.   You don't remember much?

 4        A.   2005, no, I couldn't remember.

 5        Q.   Do you remember anything that Mr. Gomez may

 6   have told you or anybody else at the Car Shack when he

 7   first came to the dealership in September 2005?

 8        A.   No, I don't.

 9        Q.   He came one time by himself?

10        A.   By himself, yes.

11        Q.   Then what do you recall about that one time

12   that he came by himself?

13        A.   Tried to purchase a vehicle.  We run his

14   credit report and his Beacon score was very low, so he

15   was advised that he couldn't purchase a vehicle on his

16   own, that he will need co-signer.  That's when Ms.

17   Muro stepped in or her name at least because at that

18   time she was working in Tampa, so the whole deal was

19   done via fax.

20        Q.   Do you know how old Mr. Gomez was?

21        A.   No, I don't.

22        Q.   The first time he came in the dealership,

23   your company met him to discuss him purchasing a

24   vehicle?

25        A.   Right.
```

1      Q.   As a result of that, apparently there must

2  have been some sort of discussion concerning the

3  financing of the vehicle, correct?

4      **A.   Correct.**

5      Q.   What type of vehicle was Mr. Gomez

6  interested in?

7      **A.   2002 Jag, Jaguar that is.**

8      Q.   That was a vehicle that was displayed at the

9  dealership?

10     **A.   Correct.**

11     Q.   That particular vehicle that was displayed

12  at the dealership, did it come with any warranties?

13     **A.   Yes, we give a 30 day warranty at the**

14  **dealer.**

15     Q.   Thirty day warranty?

16     **A.   Yes, motor and transmission you said.**

17     Q.   You said that the dealership ran Mr. Gomez'

18  credit report?

19     **A.   Correct.**

20     Q.   What do you mean by ran his credit report?

21     **A.   Checking his credit.**

22     Q.   How would the dealership back in

23  September 2005 check a person's credit?

24     **A.   We do his lines of credit app authorizing us**

25  **to check his credit and we do, through one of the**

1   **three, you know, credit reporting bureaus.**

2       Q.   After Mr. Gomez signed a credit application,

3   the dealership with his authorization would pull a

4   credit report?

5       **A.   Correct.**

6       Q.   Do you remember which of the three national

7   credit reporting agencies --

8       **A.   We usually run Equifax.**

9       Q.   To the best of your knowledge, Equifax

10  credit was pulled?

11      **A.   Correct.**

12      Q.   Based on that report, the dealership made a

13  decision the dealership could probably not get credit

14  for this man?

15      **A.   The finance director.**

16      Q.   Who was the name of the finance director?

17      **A.   Maria Leonardo.**

18      Q.   Does Maria Leonardo presently work at the

19  dealership?

20      **A.   Yes, she does.**

21      Q.   How long has she worked at the dealership?

22      **A.   17 years.**

23      Q.   Is she a relative of yours?

24      **A.   No, she's not.**

25      Q.   So Ms. Leonardo would typically, and the

1  best of your knowledge in this case pulled Mr. Gomez'

2  credit report?

3      A.   Correct.

4      Q.   What does the dealership do after it pulls

5  his credit report?

6      A.   Well, the dealership, you mean her?  She's

7  in charge of the financing part.

8          MR. SOBEL:  But acting for the dealership,

9      what does the dealership do.

10     A.   Well, she looks at the credit report.  She

11 sees that based on the Beacon score and the criteria

12 that the lenders use, she doesn't or he didn't qualify

13 for a vehicle.

14     Q.   What is a Beacon score?

15     A.   The score that, you know, that you're given

16 by the Equifax or any credit reporting agency.  They

17 call it a Beacon score.

18         MR. SOBEL:  Just so you know, that's another

19     one like Fair Isaacs & Company.  Some of them use

20     Beacon, too.  In case you didn't realize it.  I

21     don't know.

22         MR. MURPHY:  Just for your edification, I'm

23     clearing it for the record.

24         MR. SOBEL:  I'm sorry, I'm sorry, you looked

25     quizzical, so I thought you didn't know.  No harm

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

14

1       in not knowing.

2            MR. MURPHY:   The quizzical look is sometimes

3       so I don't look like a know it all, not that I

4       know everything.

5       Q.   After Mr. Gomez' credit report was pulled

6   and someone evaluated his Beacon score, a decision was

7   made by the Car Shack to not extend him credit,

8   correct?

9       A.   Well, it's not -- if you go back, the Car

10  Shack is not in the business of financing.   The Car

11  Shack is in the business of selling used cars.

12  Financing is done by the banks, and as I told you a

13  minute ago, the criteria that the banks used in order

14  to give you credit based on that, she knew that he

15  wouldn't qualify for the vehicle or she wouldn't get

16  approval through --

17      Q.   You're saying she, you're referring?

18      A.   Ms. Leonardo, yes.

19      Q.   You brought some papers in response to the

20  Notice of Taking Deposition Duces Tecum today,

21  correct?

22      A.   Correct.

23      Q.   Among the papers I trust is something called

24  a Retail Installment Sales Agreement, correct?

25      A.   Right.

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

1      Q.   Can you provide me with the Retail

2   Installment Agreement from your file?

3      **A.   By the way, this is the first buyer's order**

4   **she signed.**

5           MR. SOBEL:  For the record, while he looks,

6        he brought that up because he told me I don't

7        think I had that before and I may not have given

8        it to you.  In other words, there was two or three

9        signs.  That was the first one.

10          MR. MURPHY:  I don't have that one.

11          MR. SOBEL:  That's what I'm saying.  That's

12       why he brought it out now.  Here's a copy.

13     Q.   This is a copy for me?

14          MR. SOBEL:  Is that for him?

15     **A.   I didn't make any copies.  I believe you do**

16   **have it with you.**

17          MR. SOBEL:  I have all the copies.

18     Q.   Do you mind if I mark this?

19          MR. SOBEL:  No, you can mark it.

20     Q.   Just for the record, you see where I'm

21   putting the sticker, there's nothing on there,

22   correct, underneath?

23     **A.   Right.**

24     Q.   I'm going to show you what's been marked for

25   identification as Plaintiff's Exhibit 1.  Can you

```
 1  identify that document?
 2       A.    Yes, retail installment contract.
 3       Q.    Is that from your file?
 4       A.    Correct.
 5       Q.    Is that a true and correct copy of the
 6  document in your file?
 7       A.    Yes, it is.
 8       Q.    Is it a complete copy of that document?
 9       A.    I believe so, yes.  Two part.
10       Q.    You earlier mentioned that the Car Shack was
11  not a creditor for purposes of financing vehicles; is
12  that a correct statement?
13       A.    What was that again?  I didn't quite
14  understand.
15       Q.    Read it back.
16            (The referred question was read back.)
17       A.    Depending on how you see it, I guess.  I
18  mean what I said is the Car Shack is not in the
19  business of, you know, lending money to the customer.
20  We do provide the financing for them that -- we act as
21  agent from the bank because we do have what you call a
22  contract with the bank.  We are approved by the bank
23  to work on their behalf.  So we don't do any
24  financing.  We do the financing for the customer if
25  they request us to do so.  The customer can get their
```

1    **own financing through any bank if they wish.**

2         Q.   On the top of the document marked for

3    Plaintiff's Exhibit 1 there's a block, and the block

4    is on the right hand side.  Can you read that?

5         **A.   Credit of seller.**

6         Q.   What's beneath it?

7         **A.   Car Shack.**

8         Q.   So under this particular document the credit

9    seller is the Car Shack?

10        **A.   The seller is the Car Shack.  The creditor**

11   **is C.P.S. which is on the same contract right here.**

12        Q.   Are you familiar with the expression

13   creditor seller or something to that effect under the

14   Retail Installment Act?

15        **A.   No, I don't.**

16        Q.   You never heard that expression before?

17        **A.   No, I never did.**

18        Q.   The document, Plaintiff's Exhibit 1, was

19   never signed, correct by Ms. Muro, was it?

20        **A.   Which one?**

21        Q.   Plaintiff's Exhibit 1?

22        **A.   I believe it was, yes.**

23        Q.   Do you have a signed copy of the retail

24   installment contract?

25        **A.   (Indicating).**

1    Q.    This particular contract was for what

2  purpose?

3    A.    Pride Financing.  Help her get financing

4  through one of our lenders.

5    Q.    Did she get financing through one of her

6  lenders under that particular contract?

7    A.    Under that particular contract, yes.

8    Q.    Same terms.

9    A.    What do you mean same terms?

10   Q.    Same terms, in terms of finance, charge,

11  interest rate?

12   A.    What is the other term?

13   Q.    I'll get back to that.

14   A.    Okay.

15   Q.    Do you have a copy of something called a

16  buyer's order for Ms. Muro?

17   A.    I just gave you one.  We have a few.

18   Q.    Why do you have a few?

19   A.    Because the first one was signed via fax

20  without a warranty.  There's another one upon her

21  request that she needed to get an extended warranty

22  that is not the standard thirty day warranty we offer.

23  So the next one, the next buyer's order was done

24  reflecting the warranty.  That's why we have two.

25      Q.    Which one was signed by the dealership?

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

19

1      A.    I don't know.   I would have to look in my
2  records.
3      Q.    Going back to Jonathan Gomez, after his
4  credit report was pulled and after his Beacon score
5  was reviewed and after considering some other factors,
6  a decision was made that he could not finance a
7  vehicle, correct?
8      A.    Correct.
9      Q.    That decision was made by the Car Shack,
10  correct?
11      A.    By -- yes.
12      Q.    What notice was provided to Mr. Gomez that
13  informed Mr. Gomez on this decision on the part of the
14  dealership?
15      A.    A verbal notice at the dealer.
16      Q.    Do you know whether or not a verbal notice
17  to a consumer such as Mr. Gomez complied with the
18  requirements of the Fair Credit Reporting Act and the
19  Fair Credit Opportunity Act?
20      A.    I do not know.
21      Q.    Is it the practice of the Car Shack to not
22  provide notice in writing to persons who are denied
23  credit?
24      A.    Let me tell you a little more about the
25  financing part.   After you submit a buyer's order and

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

20

1    credit app to the banks and they deny it, not us, but

2    the bank denies credit to a particular person, the

3    bank sends each customer a notice in writing.

4        Q.    Was that done with respect to Mr. Jonathan

5    Gomez?

6        A.    I have no idea.  It will be a question for

7    the bank.

8        Q.    Here's the question based on your records

9    and your recollection of what occurred.  Was any

10   application, credit application forwarded to any

11   financial institution on behalf of Mr. Gomez?

12       A.    I wouldn't remember.

13       Q.    If I were to tell you Mr. Gomez did not sign

14   a finance agreement, would you believe that any notice

15   or record or documents or applications were sent to

16   any finance company, such as a bank on behalf of

17   Mr. Gomez?

18       A.    Mr. Gomez couldn't have signed a finance

19   agreement.

20       Q.    Why is that?

21       A.    Because the only time that you sign a

22   finance agreement, if you haven't bought a car yet,

23   which I'm sure you have, is when you're approved.

24       Q.    Okay.

25       A.    That's the only time.

1      Q.    Is that your understanding?

2      A.    That's the only time you sign the finance

3  agreement, when you are approved by the bank and the

4  bank will send you what is called a call pack, which

5  is a fax where the bank tell us the time given to the

6  customer and the interest rate that the customer will

7  get based on the credit report.

8      Q.    Are you familiar with the expression fax

9  back?  Is it also called a fax back?

10     A.    Fax back, I wouldn't know, no.

11     Q.    At one point or another Mr. Gomez was told

12 he needed a co-signer, correct?

13     A.    Correct.

14     Q.    Was the co-signer obtained by Mr. Gomez?

15     A.    Yes, it was.

16     Q.    Who was the co-signer?

17     A.    Ms. Muro.

18     Q.    Ms. Muro came to the dealership first or she

19 spoke to someone at the dealership.  Can you tell me

20 what happened?

21     A.    Ms. Muro was contacted.  She was sent a

22 credit app by fax.  Sign it, fax it back, run her

23 credit report, her credit on her request or Mr. Gomez'

24 request, at Ms. Muro's request, the application was

25 sent to the bank.  That's it.

22

```
 1        Q.   What bank was the credit application sent
 2   to?
 3        A.   C.P.S.
 4        Q.   Consumer Portfolio Services?
 5        A.   That's correct.
 6        Q.   Are you still doing business with Consumer
 7   Portfolio Services?
 8        A.   Yes, we do.
 9        Q.   Do you know whether C.P.S. actually owns any
10   of the finance agreements or do they sell them to
11   third parties?
12        A.   I wouldn't know.
13        Q.   Have you ever heard that C.P.S. buys paper
14   from dealerships and then transfers it to portfolios?
15        A.   I have no idea.
16        Q.   Just asking.  Did Ms. Muro sign a buyer's
17   order?
18        A.   She signed a couple, yes.
19        Q.   Can you go through your file, and I'll give
20   you back what you gave me and find all the buyer's
21   orders signed by Ms. Muro?
22        A.   This is the first one she signed via fax.
23        Q.   This is the fax version, correct?
24        A.   Yes, the very first one.
25        Q.   I'm going to mark this as Plaintiff's
```

1  Exhibit 2.  I'm going to show you what's been now

2  marked as Plaintiff's Exhibit 2.

3        A.   Yes.

4        Q.   That is the first buyer's order signed by

5  Ms. Muro?

6        A.   Correct.

7        Q.   This was sent to her for her signature by

8  the dealership by Ms. Leonard?

9        A.   By Ms. Leonardo, yes.

10        Q.   She apparently sent it back, correct?

11        A.   Correct.

12        Q.   Did she send it back with the credit

13  application the same time or was the credit

14  application before this?

15        A.   The credit application should be before

16  this, yes.

17        Q.   Did this first version of the so-called

18  buyer's order, Plaintiff's Exhibit 2, have any terms

19  of credit on it?

20        A.   No, it doesn't.

21        Q.   Why is that?

22        A.   Because we -- again, we're in the business

23  of selling vehicles, so she was given the option of

24  obtaining her own financing or if she wants help from

25  us, we could help her get the financing.

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

24

1      Q.   After she signed Plaintiff's Exhibit 2, what
2  did the dealership do?
3      A.   **We submitted the buyer's order, credit app**
4  **and the credit bureau to C.P.S.**
5      Q.   Was there a finance agreement?
6      A.   **After she was approved, yes.**
7      Q.   The finance agreement is Plaintiff's Exhibit
8  1?
9      A.   **Correct.**
10     Q.   So it's your testimony that a retail
11 installment agreement such as that, which is depicted
12 as Plaintiff's Exhibit 1 was not signed by Ms. Muro
13 before the finance company received a copy of the
14 buyer's order and credit app?
15     A.   **Yes.   That's the way the order usually goes,**
16 **yes.**
17     Q.   When in context of time, how soon after the
18 buyer's order and credit app was sent to C.P.S. was
19 she approved by C.P.S. for financing?
20     A.   **How long of a --**
21     Q.   Yes.
22     A.   **On this particular deal I do not remember.**
23          THE WITNESS:   Should I tell him about this?
24          MR. SOBEL:   Wait until he asks.
25     Q.   What do you want to tell me?

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

25

1      A.    This is the back of this.  This is a

2  generic, computer generated --

3          MR. SOBEL:  That wasn't given to you before

4      because I didn't have it either.

5          MR. MURPHY:  This was never produced before,

6      correct?

7          MR. SOBEL:  Yes, I didn't have it.  As he

8      just explained, which he explained to me before,

9      it was printed out by computer, but separate

10     pages.  That's all he had sent me instead of back

11     to back.

12     Q.    Do you know whether or not the second page

13  of Plaintiff's Exhibit 2 was given to Ms. Muro?

14     A.    Yes, it was.

15     Q.    On her copy that she took home?

16     A.    Yes.

17     Q.    Do you know whether or not that's the

18  practice of the dealership to send its customers home

19  with buyer's orders with the front and back pages?

20     A.    Yes, it is.

21     Q.    I'm going to show you what will be marked

22  for identification as Plaintiff's Exhibit 3.  Can you

23  identify that document?

24     A.    It's a buyer's order.

25     Q.    Does it appear to have an original signature

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

26

1    on it?

2         A.    Yes.

3         Q.    Is there a back page to it?

4         A.    **No, there isn't.**

5         Q.    Why is that?

6         A.    **Because it's computer generated and the**

7    **computer, you know, prints it out in separate pages.**

8         Q.    So a customer may leave the dealership

9    without the back part of the Exhibit?

10        A.    **Rule is that all the paperwork is put in an**

11   **envelope and the envelope is given to them with**

12   **buyer's order, copy of the finance agreement, very**

13   **important, the temporary plate registration, proof of**

14   **insurance inside an envelope.**

15        Q.    So if the computer didn't print out the back

16   page, the customer wouldn't have gotten it, correct?

17        A.    **If we happen to come across a dumb computer,**

18   **yes.**

19        Q.    Do you have any reason to doubt that this

20   was the original document given to Ms. Muro?

21        A.    **Any reason to doubt what?**

22        Q.    That this is the original document?

23        A.    **I don't remember.  I don't -- I don't know.**

24        Q.    You weren't present when she was signing

25   these papers, were you?

1    A.    No, I wasn't.

2    Q.    Then after she signed the buyer's order,

3    Plaintiff's Exhibit 2, that you say she faxed back to

4    the dealership, and it appears to be on top Park Crest

5    Apartments; that was her employer, correct?

6    A.    I believe so.

7    Q.    That was on September 15, 2005?

8    A.    Uh-huh.

9    Q.    What happened then?

10   A.    All the paperwork was signed.  She requested

11   the vehicle to be delivered to her son, Mr. Gomez,

12   Mr. Jonathan, and that was the end of it.

13   Q.    What day did she sign the paperwork?

14   A.    I believe it was the same day, September

15   15th.

16   Q.    Was she living in the area at the time?

17   A.    I have no idea.

18   Q.    I think you mentioned she was living out of

19   the area?

20   A.    No, she works at the --

21   Q.    She worked at an apartment complex?

22   A.    I don't know where she lives.

23   Q.    She came the same day or maybe the next day?

24   A.    She came in, let me see, to refresh my

25   memory.  I don't remember.

1      Q.   September 17th, maybe?

2      **A.   Yes, 9-17, Ms. Muro arrive at the Car Shack.**

3  **And signed the documents including all title work and**

4  **finance contract dated 9-17-05.**

5      Q.   Are you reading from notes?

6      **A.   Yes.**

7      Q.   May I see your notes, please?

8      **A.   Sure.   (Handing).**

9          MR. SOBEL:  You can mark that as an Exhibit.

10      They obviously weren't made contemporaneously.  He

11      did it in preparation for this deposition going

12      over his files.  You should know.  That's a good

13      history.  You want to mark it, that's fine.

14      Q.   According to your notes, September 17th

15  Ms. Muro arrived at the Car Shack and signed all

16  documents including title work and finance contract,

17  correct?

18      **A.   Correct.**

19      Q.   Let me show you what's been marked for

20  identification as Plaintiff's Exhibit 4.  Can you

21  identify it?

22      **A.   Yes.**

23      Q.   What is it?

24      **A.   It's my notes.**

25      Q.   These are your notes made from records and

29

1   discussions you've had with other people?

2       **A.    Yes.**

3       Q.    According to you, this is a true and correct

4   statement of the events that occurred, correct?

5       **A.    It's very close, yes, recollection of what**

6   **happened two years ago.**

7       Q.    You relied upon these notes in testifying

8   today?

9       **A.    Correct.**

10      Q.    These are statements made by you, correct?

11      **A.    By me and Ms. Leonardo, yes.**

12      Q.    What happened after Ms. Muro signed

13  Plaintiff's Exhibit 1?  By the way, there's a second

14  page that you didn't photocopy, the back part of it?

15      **A.    Pardon me?**

16      Q.    Plaintiff's Exhibit 1 is the front of the

17  retail installment contract which is an 11-inch

18  document, there's a reverse side.  Do you have the

19  reverse side?

20      **A.    No, we don't have the reverse side.**

21      Q.    Is that the best copy you got?

22      **A.    I think I can provide you with another one**

23  **if you want the reverse side, yes.**

24      Q.    After she signed Plaintiff's Exhibit 1, was

25  she approved for financing by C.P.S.?

Muro v. Hermanos Auto                     7/10/07                        Ernesto Sanchez

30

1      A.    Yes, after she signed the first one, yes.

2      Q.    Then what happened?

3      A.    Then the contract was submitted to C.P.S.

4      Q.    What happened after it was submitted?

5      A.    Ms. Muro started complaining that she

6   wasn't, you know, happy with the vehicle because it

7   had a mechanical problem which we agreed to fix it

8   under the warranty even though it was just a $20 part.

9   She calls C.P.S. at several locations and the finance

10  company decided that she was, you know, she was, you

11  know, too much of a headache.  She was complaining.

12  They didn't want to deal with her, so the contract

13  came back.

14     Q.    Then what happened?

15     A.    She was denied credit.  She wasn't denied

16  credit, but the contract came back so we didn't have a

17  contract back then.

18     Q.    What notice did the Car Shack provide to

19  Ms. Muro concerning --

20     A.    We sent her a letter.

21     Q.    Concerning the rejection of her by C.P.S.?

22     A.    We sent her a letter stating that we didn't

23  have any financing, to go get her own financing.  This

24  is a letter that she was sent in writing.

25           MR. SOBEL:  What's the date of that?

DOWNTOWN REPORTING
(954) 522-3376

1    Q.   October 13th.   I'm showing you what's been

2    marked as Plaintiff's Exhibit 5 for identification.

3    Can you identify that document?

4        A.   It's a letter sent to Ms. Muro.

5        Q.   What was the purpose of the letter?

6        A.   Letting her know that the financing was not

7    honored by C.P.S. because of her request or her

8    complaints, I should say.

9        Q.   Did you keep a photocopy of the letter that

10   you sent to her?

11       A.   Did I keep a photocopy?  I believe we did.

12   This is the copy or she was sent a copy.

13       Q.   This is the version which came from your

14   computer, correct?  This is just printed up from a

15   letter that you he saved on the memory of the

16   computer, correct?

17       A.   Correct.

18       Q.   This wasn't a photocopy of the version that

19   was signed by you and sent to her, correct?

20       A.   It might be a duplicate then.

21       Q.   This is substantially the same as the letter

22   that was sent, correct?

23       A.   Correct.

24       Q.   For purposes of your company, this is

25   exactly the same information that was provided to her,

Muro v. Hermanos Auto                    7/10/07                      Ernesto Sanchez

32

1    correct?

2         A.    Correct.

3         Q.    Are there any other buyer's orders signed by

4    Ms. Muro?

5         A.    (Handing).  I believe this is the next one

6    from.

7         Q.    This has got an Exhibit A attached to it.

8    Is this the only version you have in your business

9    file?

10        A.    (Handing).  I believe it's the same.

11        Q.    This is the unsigned version by the

12   dealership.  This is the signed version.  That came

13   from my records apparently.  This is the one from your

14   records, correct?

15        A.    Correct.

16        Q.    You agree with me you co-mingled some

17   records here, correct?

18             MR. SOBEL:  Was this attached to your

19        complaint?

20             MR. MURPHY:  That's attached to the

21        complaint.  It's the same document.

22        A.    This is the same, but it's signed.

23        Q.    Plaintiff's Exhibit 6, can you identify it?

24        A.    It's a buyer's order, second buyer's order

25   signed by Ms. Muro.

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

33

1              MR. SOBEL:  These are different dates.  17th
2        and that's the 15th.
3        Q.   Which of these documents was submitted to
4   the finance company?
5        A.   **That one, the one that you have as Exhibit**
6   **1, I believe, Exhibit 2.**
7        Q.   This one unsigned by her?
8        A.   **I believe it's her signature there.**
9        Q.   This one has the signature of the
10  dealership, 2?
11       A.   **Yes, Maria Leonardo's signature.**
12       Q.   She signed that on behalf of the dealership,
13  correct?
14       A.   **Correct.**
15       Q.   You can recognize her signature, correct?
16       A.   **Correct.**
17       Q.   Plaintiff's Exhibit 5 for identification has
18  in it the terms of financing, correct?
19       A.   **On the second one, yes.**
20       Q.   This was sent to the finance company?
21       A.   **No, this was not sent to the finance**
22  **company.  This was sent to the finance company.**
23       Q.   Why would there be two documents signed that
24  are considered to be buyer's order, one of which has
25  the terms of financing?

Muro v. Hermanos Auto                7/10/07                Ernesto Sanchez

34

1      A.   Because if you remember, this is sent to the

2  finance company in order to get approval on her

3  request.  After she's approved, the buyer's order, in

4  the computer you enter the vehicle information, her

5  information and the interest rate on the system and

6  the computer prints everything out, the buyer's order

7  followed by the contract and all the paperwork that's

8  required by federal law for her to sign.  So this and

9  this go together after she is approved by the finance

10 company.

11     Q.   For purposes of so this is clear for the

12 record, Plaintiff's Exhibit 2 was the first document

13 signed that's considered a buyer's orders or bill of

14 sale, correct?

15     A.   Correct.

16     Q.   At a later time after the terms of financing

17 were approved, Plaintiff's Exhibit 1 which is a

18 financial agreement and Plaintiff's Exhibit 2 which is

19 a buyer's order were signed, correct?

20     A.   Correct.

21     Q.   Plaintiff's Exhibit 6?

22     A.   You said 2.

23     Q.   Plaintiff's Exhibit 6 is a contract,

24 correct?

25     A.   It's a buyer's order.

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

35

1     Q.   Did Ms. Muro have the ability to rescind

2  this contract without the approval of the dealership?

3     A.   Excuse me?

4     Q.   Did Ms. Muro have the ability to rescind

5  this document without the approval of the dealership?

6          MR. SOBEL:   Do you know what rescind means?

7     A.   No.

8     Q.   Cancel it?

9     A.   Cancel it without the --

10    Q.   Approval of the dealership?

11    A.   I wouldn't know.

12    Q.   If you can, I'm going to take a highlighter.

13  Can you read the highlighted portion of that document?

14         MR. SOBEL:   Out loud?

15    Q.   Out loud into the record.

16    A.   Jesus, I didn't bring my reading eye

17  glasses.  Purchase buyer agrees that this order

18  includes all of the terms and conditions herefore.

19  That this order cancels and supercedes any prior

20  agreement written or verbal.  Purchaser agrees to pay

21  the total payments in accordance with the payment

22  schedule shown above.  This order shall not become

23  binding until accepted by the dealer or his or his

24  authorized representative.

25    Q.   Above the highlighted portion were terms of

1  financing, correct?

2      A.    Correct.

3      Q.    The terms of financing were 17.950 percent

4  A.P.R.?

5      A.    I believe so, yes.

6      Q.    Finance charge $8,227.38?

7      A.    Yes.

8      Q.    Something called T.O.T. payments,

9  $23,989.20, correct?

10     A.    Correct.

11     Q.    T.O.T. means total of payments?

12     A.    I think so, yes.

13     Q.    Then below that, the balance to be paid in

14 60 payments at $399.82.  First payment is due 10-17-05

15 and then monthly, correct?

16     A.    Correct.

17     Q.    The document you have before you is, in

18 fact, signed by the dealership?

19     A.    Correct.

20     Q.    This document became binding on both parties

21 when it was signed, correct?

22     A.    Again, yes, it is, together with the finance

23 contract and the rest of the paperwork.  It's a lot of

24 papers.

25     Q.    Does the buyer's orders reference any other

```
1    document?
2         A.    The back of it, yes.
3         Q.    The back of it which you've shown to be part
4    of Plaintiff's Exhibit 2.  Do you have the back of
5    Plaintiff's Exhibit 6?
6         A.    Which is this.
7         Q.    Do you have the original Plaintiff's Exhibit
8    6?
9         A.    Do I have the original?  We should have it,
10   yes.  Did I give you that?
11             MR. SOBEL:  No, you only gave me copies
12        initially.
13        A.    (Handing).
14        Q.    That's the original for Plaintiff's Exhibit
15   6 or do you know?
16        A.    Looks like the original to me, yes.
17        Q.    Is there a reason why there isn't a document
18   that has got a reverse side on it that a person who
19   signs Plaintiff's Exhibit 6 can see the reverse side?
20        A.    It's computer generated as far as I know.
21   The computer is not able to print two sides.
22        Q.    That's because your company has a computer
23   program it bought from a third party, correct?
24        A.    Correct.
25        Q.    That computer program would allow you to
```

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

1    create a reverse side if your printer had the capacity
2    to make a reverse side, correct?
3        **A.    I don't know.  I'm not so much with**
4    **technology.**
5        Q.    Well, you would agree with me that it would
6    be prudent to have a form that your company uses on a
7    day-to-day basis in a matter that a consumer can look
8    at both sides of the same document and not have to
9    guess which one he signed?
10       **A.    I wouldn't agree with you, no.**
11       Q.    I showed you the version of what my client
12   received from the dealership and it does not have a
13   reverse side.  Do you have any reason to dispute the
14   fact that my client believes that there was no reverse
15   side to the paper she signed?
16       **A.    This was faxed to her.  As you see, the fax**
17   **came back and she signed everything.**
18       Q.    Is there any reference to reverse side on
19   Plaintiff's Exhibit 6?  Is there a reference to
20   reverse side on Plaintiff's Exhibit 6?
21       **A.    What do you mean?**
22       Q.    Well, does Plaintiff's Exhibit 6 refer to a
23   reverse side?  Have you looked at the document
24   recently?
25       **A.    No, I haven't.**

1        Q.    It says on the bottom of the printed form in

2    that block, I have read the face of this order and

3    agree to this purchase price.   I hereby certify I'm 18

4    years of age or older.   It says the face of this

5    order.   It doesn't refer to a reverse side.

6        **A.    I guess.   I wouldn't know.**

7        Q.    Do you think it's deceptive to have a

8    document that's got a reverse side that a consumer

9    doesn't receive?

10       **A.    I wouldn't know.**

11       Q.    Do you think it's deceptive that a document

12   that says that this includes all terms and conditions

13   hereof and then the dealership imposes additional

14   conditions on a document the consumer does not

15   receive, whether that's deceptive?

16       **A.    I don't quite understand, no.**

17       Q.    The document on the face of the highlighted

18   portion you read into the record says that this order

19   include all the terms and conditions hereof.   If

20   there's no reverse side on the form that the consumer

21   received, do you believe that's deceptive?

22       **A.    Well, this is the reverse side and both of**

23   **them are signed by the customer.**

24       Q.    That's what you're saying, but obviously

25   there isn't a reverse side of the document that you

1   have in your hands.  That's a second page, not a

2   reverse side.

3        A.    Yes, I guess if you put it that way.

4        Q.    If the consumer doesn't receive the second

5   page and it's not connected by way of any reference on

6   the first page then your company can substitute any

7   pages it wants, correct?

8        A.    If the customer doesn't receive the second

9   page and is not signed by her, yes, I will imagine

10  that is deceptive.  In this case she did receive it

11  and signed it.

12       Q.    Do you know whose handwriting is the number

13  60 and then at 399.82 on the face of Plaintiff's

14  Exhibit 6?

15       A.    I wouldn't know.  I would imagine it's

16  Mrs. Leonardo's.

17       Q.    Why would she do that?

18       A.    I wouldn't know.

19       Q.    After Ms. Muro was denied financing,

20  according to you, did the dealership present different

21  finance terms to Ms. Muro?

22       A.    Can you repeat the question?

23       Q.    After Ms. Muro was informed by the

24  dealership that she would not receive financing under

25  the terms set forth in Plaintiff's Exhibit 6, did the

1  dealership inform Ms. Muro that they were going to

2  provide different terms of financing?

3      A.    If I'm not mistaken, Mrs. Leonardo after

4  sending her the letter or Mrs. Muro called and they

5  discussed the, you know, helping Mrs. Muro get a

6  second finance agreement and she was going to also do

7  try to get financing on her own, and if I remember

8  well, a month and a half, two month later, a month and

9  a half later we did provide her with a second finance

10  agreement on her behalf.

11     Q.    What were the terms?  Do you have a copy of

12  the second finance agreement?

13     A.    That I don't know.  I do not have it with

14  me.  I'm going to have to look for it.

15     Q.    What were the new terms that were proposed

16  to Ms. Muro?

17     A.    I don't remember.

18     Q.    If you went to your notes, would that be

19  something we could rely upon?

20     A.    Well, the finance contract, all the numbers

21  are right there.  If I tell you right off my head, I'm

22  sure I'm going to be incriminating myself.  I rather

23  have the original.

24     Q.    Your notes say on 9-30-2005 pre-approval was

25  received by Citi Financial.  The interest rate was

1   lower than the one originally obtained on 9-30-2007,

2   but not as low as the term received by C.P.S. due to

3   the customer's credit history.   These are your notes,

4   correct?

5       A.    Correct.

6       Q.    Is that a true statement?

7       A.    Yes.

8       Q.    So there were different terms because of the

9   customer's credit history, correct?

10      A.    Correct.

11      Q.    The interest rate was higher than that

12  reflected on Plaintiff's Exhibit 6, correct?

13      A.    A little higher, correct.

14      Q.    In fact, it went up a couple of points with

15  respect to the interest rate, correct?

16      A.    Make a difference about $5, $10 monthly

17  payments.

18          MR. SOBEL:   Don't look for that now.   You

19      have to listen to the questions.

20      Q.    Did Ms. Muro agree to redo the deal?

21      A.    No, she didn't.

22      Q.    What did she tell you about that?

23      A.    That she was going to try her own financing.

24  That she can get a better rate than the one we got for

25  her.

1      Q.   Did Ms. Muro send a check to the Car Shack

2  representing the first monthly payment of $399.82?

3      A.   **Yes, she did.**

4      Q.   What did the Car Shack do when it received

5  the check?

6      A.   **We send the check back to her.**

7      Q.   Did Ms. Muro inform the Car Shack she felt

8  she had a deal, if you will, by virtue of Plaintiff's

9  Exhibit 6?

10     A.   **That she had a deal?**

11     Q.   Yes, a contract with your company to buy and

12 finance a car under the terms set forth in Plaintiff's

13 Exhibit 6?

14     A.   **No, she didn't.**

15     Q.   Did Ms. Muro provide a down payment to the

16 dealership?

17     A.   **Yes, she did.**

18     Q.   How much was the down payment?

19     A.   **Actually the one that provided it was**

20 **Jonathan Gomez, $5000, so I guess it's not Ms. Muro.**

21     Q.   Do you know whether or not that money

22 actually came from Ms. Muro?

23     A.   **I wouldn't know.**

24     Q.   That check was cashed, correct?

25     A.   **It was not a check.  It was cash.**

1     Q.    So cash came in of $5000 and your company
2  received it, correct?
3     A.    Correct.
4     Q.    After Ms. Muro sent a payment for $399.82 to
5  the Car Shack, the Car Shack sent the payment back,
6  correct?
7     A.    Correct.
8     Q.    Did the Car Shack repossess the vehicle?
9           MR. SOBEL:  Object to the form.
10    A.    Not at the time.
11    Q.    When did it repossess the vehicle?
12    A.    I wouldn't remember.
13    Q.    How would you be able to answer that
14  question if you don't remember?
15    A.    I would have to look up the records on the
16  repossession, repo.
17    Q.    Where was it repossessed?
18    A.    It was repossessed by another company.
19    Q.    Where was it repossessed?
20    A.    I have no idea.
21    Q.    How long did Ms. Muro have the vehicle?
22    A.    If I'm not mistaken, a little more than
23  three months.
24    Q.    Do you know how much the vehicle was driven
25  during that three month period?

Muro v. Hermanos Auto                          7/10/07                          Ernesto Sanchez

45

1     A.    About 10,000 miles.

2     Q.    Do you have any records that would

3  demonstrate the mileage difference?

4     A.    The repo company report.

5     Q.    Have those records been produced in this

6  court case?

7     A.    Not yet.

8     Q.    Are you aware of the request for production

9  asking for records such as that?

10    A.    Did you request them?

11    Q.    You just said it was a 10,000 mile

12  difference?

13    A.    About, yes.

14    Q.    Three months?

15    A.    Correct.

16    Q.    That's based on someone else's records or

17  your records?

18    A.    Based on the fact that when we sold her the

19  vehicle, the vehicle was 55,244 miles.  If I'm not

20  mistaken, when we repo'd the vehicle, it had like

21  60,000 something miles.  The report from the repo

22  company should state the miles.

23    Q.    Did the Car Shack sell this vehicle to

24  another consumer after Ms. Muro had purchased the car?

25    A.    Yes, we did.

Muro v. Hermanos Auto                     7/10/07                          Ernesto Sanchez

46

```
 1          Q.    To whom did it sell the vehicle to?

 2          A.    I don't remember.

 3          Q.    Do you remember what mileage disclosure for

 4    purpose of the title?

 5          A.    I don't remember.

 6          Q.    What did you sell the car to the next

 7    purchaser for?

 8          A.    I wouldn't remember.

 9          Q.    You have those records, correct?

10          A.    No, I don't.  I didn't bring the file.

11          Q.    Was Ms. Muro required to insure the vehicle

12    when she left the Car Shack with the vehicle?

13          A.    Yes, she was.

14          Q.    Why was that?

15          A.    Because in order to protect the company, we

16    are required to collect a proof of insurance before

17    the vehicle leaves the dealer.

18          Q.    Because at the time the customer leaves the

19    dealership with the vehicle, the ownership of the

20    vehicle, was it basically assigned to the customer,

21    correct?

22          A.    Can you repeat that?

23          Q.    You require that the vehicle be insured

24    before it leaves the dealership, correct?

25          A.    Correct.
```

1      Q.   That's because if the vehicle gets wrecked,

2  the responsibility for the damage to the vehicle is

3  that of the person buying the car, correct?

4      A.   If she has insurance, yes.  If she doesn't

5  have insurance, then it becomes the responsibility of

6  the dealer.

7      Q.   Your dealership does not have -- you know

8  what used car buyer's guides are, right?

9      A.   Yes.

10      Q.   What are they?

11      A.   Federal odometer disclosure and we're

12  required to have to display it on the windows.

13      Q.   I'm sorry to interrupt, you said odometer?

14      A.   No, it's a warranty, as is warranty.

15  Federal.  I don't remember the exact name.  You want

16  me to look it up.

17      Q.   Back in September 2005, the dealership did

18  not have the required window stickers on the cars,

19  correct?

20      A.   We always had window stickers on the cars,

21  yes.

22      Q.   Always?

23      A.   Always.

24      Q.   In what language?

25      A.   We should have it in English and Spanish.

Muro v. Hermanos Auto                    7/10/07                          Ernesto Sanchez

48

1       Q.    Did you have a Spanish version of the used

2  car buyer's guide on the vehicle that my client

3  purchased?

4       A.    I don't remember.

5       Q.    My client is a person who speaks Spanish,

6  correct?

7       A.    She speaks English.

8       Q.    She speaks English and Spanish, correct?

9       A.    I would imagine so, but the transaction was

10 done in English.

11      Q.    How do you know that?

12      A.    Because of the letters, because myself, I

13 spoke to her, and if I tell you her English is better

14 than mine or her English is better than her Spanish

15 so.

16      Q.    She actually went to the car lot with her

17 son to pick up the car, correct?

18      A.    No.

19      Q.    When she signed the papers that you

20 described as Plaintiff's Exhibit 1 and 6, those were

21 signed physically at the dealership, correct?

22      A.    Exactly.  She came to the lot to sign the

23 paperwork.  The car was delivered to her son on her

24 request.

25      Q.    After she signed the papers?

1      A.    Before she signed the papers.

2      Q.    Are you certain of that fact?

3      A.    Oh, yes.

4      Q.    How do you know that?

5      A.    Because the kid wouldn't leave the lot

6  without the vehicle.  He was dying to drive the

7  vehicle.

8      Q.    After your company repossessed the vehicle,

9  did you send Ms. Muro any letters in informing

10  Ms. Muro of her right to redeem the vehicle from the

11  dealership?

12      A.    Yes, we did.

13      Q.    What letters did you send?  So maybe this

14  could help, Plaintiff's Exhibit 7?

15      A.    You have it already.  Thank you very much.

16      Q.    Is that the notice that you sent to

17  Ms. Muro?

18      A.    It looks like it.

19      Q.    I'm asking a question.  Were there any other

20  letters sent to her after repossession of the car that

21  informed her of her right to redeem the vehicle?

22      A.    Correct, this is it.  Yes.

23      Q.    Why was that sent to Ms. Muro?

24      A.    Because she did not want to bring the car

25  after we requested her to bring the vehicle out.

1   We'll return her down payment minus the repairs and

2   she'll deny -- as a matter of fact, she didn't hide

3   the -- she did hide the vehicle and we send her a

4   letter.  We try to, you know, report it to the police

5   to see if they could help us out.  Here's the case

6   number.  And she left no choice but to send the repo

7   company after her.

8          Q.   That happened, correct?

9          A.   Yes.  Let me see if I find one of the

10  letters we sent her requesting her to bring the

11  vehicle back since she couldn't obtain financing.

12  There was nothing else to do.

13         Q.   Just to save you some time, and I think we'd

14  all agree, Mr. Sobel, the attorney for the Car Shack,

15  sent at least one letter to Ms. Muro asking for the

16  vehicle back, correct?

17         A.   Correct.

18         Q.   That was before the vehicle was repo'd, was

19  in fact, repossessed?

20         A.   Pardon me?

21         Q.   That was before the vehicle was repossessed?

22         A.   That was before the vehicle was -- we took

23  possession of the vehicle, yes.

24         Q.   After the vehicle was repossessed by the Car

25  Shack, this letter, Plaintiff's Exhibit 7 was sent,

1    correct?

2         A.    Yes, but let me clarify a little bit about

3    the repossession thing.  We took possession of our

4    vehicle.  Repossession is actually when the car is

5    financed and she's not able to pay for it.  On this

6    particular case, she was not able -- I mean she wasn't

7    financed.  There was no finance company that she was

8    making payments to.  We the dealer was requesting her

9    to bring the vehicle back because, you know, we

10   couldn't or she couldn't provide financing.  So we had

11   to take possession of our vehicle.

12        Q.    Is it the position of the dealership that

13   the finance agreement represented by Plaintiff's

14   Exhibit 1, which is this document here, which you've

15   previously identified, was conditional, was a

16   conditional finance agreement?

17        A.    This was the finance agreement provided by

18   the finance company, C.P.S.

19        Q.    Was the financing conditional?

20        A.    The finance contract is always conditional

21   obviously by the finance company, again, because after

22   the -- when the people with, let's say, shaky credit,

23   the finance, after all the paperwork is signed, the

24   finance company calls the customer and runs an

25   interview over the phone, so it is conditional, yes by

1  the finance company.  If they pass the interview, if

2  they see we're not lying and if the customer is happy

3  with the vehicle, then they honor the agreement and

4  send the dealer a check.  Until then the customer is

5  not approved.

6       Q.   Let me show you, I just extracted this from

7  your file, this is the reverse side?

8       A.   Correct.

9       Q.   We'll have to make a copy of it.

10           MR. SOBEL:  I like the way you just said I

11      just took it from your file.  I'm showing you

12      what's been marked for identification as

13      Plaintiff's Exhibit 8.  What is it?

14      A.   It's the original finance retail installment

15  sale contract.

16      Q.   Is that the same as Plaintiff's Exhibit 1?

17      A.   I believe it's a copy of it, yes.

18      Q.   I don't think so.  Plaintiff's Exhibit 1 has

19  got -- doesn't reference a trade-in?

20      A.   What do you mean?

21      Q.   Is there a trade-in reflected in Plaintiff's

22  Exhibit 8?

23      A.   What's on Exhibit 8?  This is 1.

24      Q.   Yes, sir.

25      A.   Yes.

53

1      Q.    Was there a trade-in?

2      A.    On this one it's not the same then.   This

3   must be the -- I would have to review it.

4      Q.    Do you have the reverse side of Plaintiff's

5   Exhibit 1?

6      A.    This one, I'm going to have to look it up,

7   also.

8      Q.    Do you have any reason why more than one

9   finance agreement was signed?

10      A.    Because as I told you before, same as the

11   buyer's order, when the first buyer's order or the

12   second buyer's order, when she requested an extended

13   warranty, then the numbers change and another finance

14   contract will have to be signed, so the negotiations

15   were -- she was going back and forth.

16      Q.    Are there any other original finance

17   agreements contained in your file such as that which

18   you have in your hand?

19            MR. SOBEL:  He means an original like 8?

20      A.    I don't know.  We have so much paperwork

21   with this lady because she was changing her mind

22   every, you know.  I wouldn't know.  No, I don't have

23   another one.

24      Q.    Plaintiff's Exhibit 1 as well as Plaintiff's

25   Exhibit 8 purport to be finance agreements, correct?

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

54

1      **A.     Correct.**

2      Q.    And you would agree with me the only

3   differences in the two documents pertain to

4   itemization of amount financed contained on the first

5   page, correct?

6      **A.     Correct.**

7      Q.    The reverse side will ostensibly be the same

8   in terms of this is the form that your company had

9   continuously during September 2005, these forms were

10  kept at your office and kept basically the same and

11  they're used by computers, like you said, to input the

12  numbers, correct?

13     **A.     Correct.**

14     Q.    Neither one of these documents contain any

15  reference at all about conditional sales, conditional

16  financing, do they?

17     **A.     I wouldn't know.  I would have to sit down**

18  **and read it for a day or so.**

19     Q.    As a matter of fact, under this particular

20  contract as well as this particular contract, they

21  have the same language, no cooling off period, state

22  law does not provide for a cooling off or cancellation

23  period for the sale.  After you signed this contract,

24  you may only cancel it if the seller agrees or for

25  legal cause.  You can not cancel this contract simply

1  because you change your mind.  This notice does not

2  apply to home solicitation sales.  This was a binding

3  contract for my client, correct?

4      **A.    Correct.**

5      Q.    There's no reference on this contract that

6  you are aware of that says anything at all about being

7  a conditional sale or conditional financing?

8      **A.    I haven't read the whole thing, no.**

9      Q.    Let's take a moment.  You can look at it and

10  tell me what the dealership's position is about

11  whether or not this is a conditional sale or

12  conditional financing.

13      **A.    Correct, no, there isn't.**

14      Q.    Is there any document that would have

15  informed Ms. Muro that the sale and financing of the

16  Jaguar was conditional?

17      **A.    On back of the buyer's order maybe.**

18      Q.    Once again, the buyer's order which says two

19  parts and there's no back to the buyer's order,

20  correct, it's two pages?

21      **A.    That is correct.**

22      Q.    Can you read the portion that actually says

23  that?

24      **A.    I'm just guessing.  I don't know.**

25          MR. SOBEL:  He says maybe.  He didn't say it

1      does.

2         A.    No, it doesn't say that.  Can I see my

3   notes?

4         Q.    (Handing).

5         A.    What was the question again?

6         Q.    Was there anything provided to Ms. Muro

7   which would inform Ms. Muro that the terms of the

8   purchase and financing of the Jaguar were conditional

9   in any way.

10        A.    I'm just thinking that there was a final

11   agreement, but the contract was cancelled at her

12   request.

13        Q.    Where is the document that you're referring

14   to?

15        A.    Well, we're going to have to subpoena the

16   representative for C.P.S. which is, if you remember

17   that I told you, she called like a few times to the

18   finance company complaining about the vehicle, that

19   she didn't want the vehicle because it was not working

20   right and, you know, she wasn't happy with it.  She

21   didn't want the vehicle, so the finance company

22   returned the contract to us on her request.

23        Q.    That's not what your notes say.  Your notes

24   say that she was rejected because of her credit.  Your

25   notes say on page 2 she was rejected based on her

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

57

1   credit?

2        A.   Where does it say that?

3        Q.   The interest rate was lower than when

4   originally obtained on 9-30-2007, but not as low as

5   the original terms offered by the C.P.S. due to the

6   customer's credit history?

7        A.   Correct, she wasn't rejected.  The contract

8   was cancelled on her request.  It was cancelled by the

9   finance company, not by us.

10       Q.   What are the names of any persons that the

11  Car Shack may call as witnesses in this lawsuit other

12  than Maria Leonardo and yourself?

13       A.   The repo man.

14       Q.   What is the name of the repo man?

15       A.   Repo, the first name is Kyoto like Kyoto,

16  Japan.  Last name, I do not recall his last name.

17       Q.   This person was not previously disclosed to

18  my office when I asked for him.

19            MR. SOBEL:  Yes, it was on my interrogatory.

20       It had to be because I remember the name in asking

21       about Kyoto.  I think it was in answers to

22       interrogatories or maybe it was on the joint

23       schedule or something.  That I remember.  Don't

24       ask me to look for it, though.

25       Q.   First name Kyoto.  Last name unknown.

1   Address not known.  This is on your mandatory

2   disclosure.  Jose Crossier?

3        A.   **That's one of the salesman.**

4        Q.   Is he still working at the dealership?

5        A.   **Yes.**

6        Q.   He's one of the salespersons -- is he the

7   person who dealt with my client?

8        A.   **No, he's not the person who dealt with your**

9   **client.**

10       Q.   So why is he listed?  What does he have to

11  add to this?

12       A.   **I would have to look it up.  I don't know.**

13       Q.   I notice that under the Rule 26 disclosure

14  that Maria Leonardo wasn't disclosed.  Is there a

15  reason why?

16       A.   **Maria Leonardo was also disclosed.**

17            MR. SOBEL:  I thought I did.  I really

18       thought I did.  I remember.  I do a lot of talking

19       to Maria.

20       Q.   I don't have anything further.  The court

21  reporter is going to make photocopies.

22            MR. SOBEL:  I don't have anything.  We'll

23       waive.  Can you make copies.  No copy.

24            (Thereupon, the Deposition was concluded

25       at 3:15 p.m.)

59

1    THE STATE OF FLORIDA
     COUNTY OF BROWARD
2

3

4         I, the undersigned authority, certify that

5    the aforementioned witness personally appeared before

6    me and was duly sworn.

7

8         WITNESS my hand and official seal this

9    16TH day of July, 2007.

10

11                        *Marla S. Arrow*

12         _____
                    MARLA S. ARROW, REPORTER
13                  Notary Public-State of Florida
                    My Commission Expires:  9-26-08
14

15

16

17

18

19

20

21

22

23

24

25

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez

60

```
 1              C E R T I F I C A T E

 2

 3   THE STATE OF FLORIDA
     COUNTY OF BROWARD
 4

 5
             I, MARLA S. ARROW, Professional Shorthand
 6   Reporter, State of Florida at Large, do hereby certify
     that the aforementioned witness was by me first duly
 7   sworn to testify the whole truth; that I was
     authorized to and did report said deposition in
 8   stenotype; and that the foregoing pages, numbered from
     1 to 61, inclusive, are a true and correct
 9   transcription of my shorthand notes of said
     deposition.
10
             I further certify that said deposition was
11   taken at the time and place hereinabove set forth and
     that the taking of said deposition was commenced and
12   completed as hereinabove set out.

13           I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative or
14   employee of any attorney or counsel of party connected
     with the action, nor am I financially interested in
15   the action.

16           IN WITNESS WHEREOF, I have hereunto set my
     hand this 16th day of July, 2007.
17

18

19
                        Marla S. Arrow
20                 _____
                   MARLA S. ARROW, REPORTER
21                 Notary Public - State of Florida
                   My Commission Expires:  9-26-08
22

23

24

25
```

Muro v. Hermanos Auto                                  7/10/07                                  Ernesto Sanchez
Page 61

**A**

**AARON** 2:5
**ability** 3:25 35:1,4
**able** 37:21 44:13
 51:5,6
**accepted** 35:23
**acronym** 3:21
**act** 16:20 17:14
 19:18,19
**acting** 13:8
**action** 60:14,15
**add** 58:11
**additional** 39:13
**Address** 58:1
**adequately** 3:24
**advised** 10:15
**affirmed** 3:10
**aforementioned**
 59:5 60:6
**age** 39:4
**agencies** 12:7
**agency** 13:16
**agent** 16:21
**ago** 4:10,12,13,14
 7:17 14:13 29:6
**agree** 32:16 38:5,10
 39:3 42:20 50:14
 54:2
**agreed** 30:7
**agreement** 14:24
 15:2 20:14,19,22
 21:3 24:5,7,11
 26:12 34:18 35:20
 41:6,10,12 51:13
 51:16,17 52:3
 53:9 56:11
**agreements** 22:10
 53:17,25
**agrees** 35:17,20
 54:24
**allow** 37:25
**amount** 54:4
**answer** 3:22 44:13
**answered** 3:23
**answers** 57:21

**anybody** 10:6
**apartment** 27:21
**Apartments** 27:5
**app** 11:24 20:1
 21:22 24:3,14,18
**apparently** 11:1
 23:10 32:13
**appear** 25:25
**APPEARANCES**
 2:1
**appeared** 59:5
**appears** 27:4
**application** 12:2
 20:10,10 21:24
 22:1 23:13,14,15
**applications** 20:15
**apply** 55:2
**approval** 14:16
 34:2 35:2,5,10
**approved** 16:22
 20:23 21:3 24:6
 24:19 29:25 34:3
 34:9,17 52:5
**area** 27:16,19
**arrive** 28:2
**arrived** 28:15
**ARROW** 3:3 59:12
 60:5,20
**Aside** 4:19
**asked** 57:18
**asking** 22:16 45:9
 49:19 50:15 57:20
**asks** 24:24
**assigned** 46:20
**assume** 3:23
**attached** 32:7,18,20
**attend** 7:6,8
**attended** 7:10,18
**attorney** 4:23 50:14
 60:13,14
**authority** 59:4
**authorization** 12:3
**authorized** 35:24
 60:7
**authorizing** 11:24
**Auto** 1:8 5:9

**automotive** 6:8,9
**Avenue** 2:3
**aware** 45:8 55:6
**A.P.R** 36:4

**B**

**back** 7:9 8:20 11:22
 14:9 16:15,16
 18:13 19:3 21:9,9
 21:10,22 22:20
 23:10,12 25:1,10
 25:11,19 26:3,9
 26:15 27:3 29:14
 30:13,16,17 37:2
 37:3,4 38:17 43:6
 44:5 47:17 50:11
 50:16 51:9 53:15
 55:17,19
**balance** 36:13
**bank** 16:21,22,22
 17:1 20:2,3,7,16
 21:3,4,5,25 22:1
**banks** 14:12,13
 20:1
**based** 12:12 13:11
 14:14 20:8 21:7
 45:16,18 56:25
**basically** 46:20
 54:10
**basis** 38:7
**Beach** 2:7
**Beacon** 10:14 13:11
 13:14,17,20 14:6
 19:4
**behalf** 2:2,5 16:23
 20:11,16 33:12
 41:10
**believe** 15:15 16:9
 17:22 20:14 27:6
 27:14 31:11 32:5
 32:10 33:6,8 36:5
 39:21 52:17
**believes** 38:14
**beneath** 17:6
**best** 3:24 12:9 13:1
 29:21

**better** 42:24 48:13
 48:14
**bill** 34:13
**binding** 35:23
 36:20 55:2
**bit** 7:25 8:1 51:2
**block** 17:3,3 39:2
**bottom** 39:1
**bought** 20:22 37:23
**Boulevard** 1:14
**bring** 35:16 46:10
 49:24,25 50:10
 51:9
**brought** 14:19 15:6
 15:12
**BROWARD** 59:1
 60:3
**bureau** 24:4
**bureaus** 12:1
**business** 1:8 5:15
 6:4,6 14:10,11
 16:19 22:6 23:22
 32:8
**buy** 9:22 43:11
**buyer** 35:17
**buyer's** 15:3 18:16
 18:23 19:25 22:16
 22:20 23:4,18
 24:3,14,18 25:19
 25:24 26:12 27:2
 32:3,24,24 33:24
 34:3,6,13,19,25
 36:25 47:8 48:2
 53:11,11,12 55:17
 55:18,19
**buying** 47:3
**buys** 22:13

**C**

**C** 3:1 60:1,1
**call** 13:17 16:21
 21:4 57:11
**called** 14:23 18:15
 21:4,9 36:8 41:4
 56:17
**calls** 30:9 51:24

**cancel** 35:8,9 54:24
 54:25
**cancellation** 54:22
**cancelled** 56:11
 57:8,8
**cancels** 35:19
**capacity** 38:1
**car** 1:9 5:1,4,6,10
 5:12,15,18 6:4,6
 6:13,20 8:14,16
 9:10,17,20 10:6
 14:7,9,10 16:10
 16:18 17:7,9,10
 19:9,21 20:22
 28:2,15 30:18
 43:1,4,7,12 44:5,5
 44:8 45:23,24
 46:6,12 47:3,8
 48:2,16,17,23
 49:20,24 50:14,24
 51:4 57:11
**cars** 14:11 47:18,20
**case** 1:3 4:5,7,15,17
 5:25 6:1 13:1,20
 40:10 45:6 50:5
 51:6
**cash** 43:25 44:1
**cashed** 43:24
**cause** 3:6 54:25
**certain** 49:2
**certify** 39:3 59:4
 60:6,10,13
**change** 53:13 55:1
**changing** 53:21
**charge** 13:7 18:10
 36:6
**check** 11:23,25
 43:1,5,6,24,25
 52:4
**Checking** 11:21
**choice** 50:6
**circumstances** 8:18
**Citi** 41:25
**clarify** 51:2
**clear** 34:11
**clearing** 13:23

Muro v. Hermanos Auto                          7/10/07                          Ernesto Sanchez
Page 62

client 5:25 8:9,10
   8:12,13 38:11,14
   48:2,5 55:3 58:7,9
close 29:5
collect 46:16
come 8:16 9:23
   11:12 26:17
coming 8:19
commenced 60:11
Commission 59:13
   60:21
common 3:22
company 10:23
   13:19 20:16 24:13
   30:10 31:24 33:4
   33:20,22,22 34:2
   34:10 37:22 38:6
   40:6 43:11 44:1
   44:18 45:4,22
   46:15 49:8 50:7
   51:7,18,21,24
   52:1 54:8 56:18
   56:21 57:9
complaining 30:5
   30:11 56:18
complaint 32:19,21
complaints 31:8
complete 16:8
completed 60:12
complex 27:21
compliance 7:23
complied 19:17
computer 25:2,9
   26:6,7,15,17
   31:14,16 34:4,6
   37:20,21,22,25
computers 54:11
concerning 7:23
   9:19 11:2 30:19
   30:21
concluded 58:24
conditional 51:15
   51:16,19,20,25
   54:15,15 55:7,7
   55:11,12,16 56:8
conditions 35:18

39:12,14,19
connected 40:5
   60:14
considered 33:24
   34:13
considering 19:5
consumer 19:17
   22:4,6 38:7 39:8
   39:14,20 40:4
   45:24
contacted 21:21
contain 54:14
contained 53:17
   54:4
contemporaneou...
   28:10
context 24:17
continuously 54:9
contract 16:2,22
   17:11,24 18:1,6,7
   28:4,16 29:17
   30:3,12,16,17
   34:7,23 35:2
   36:23 41:20 43:11
   51:20 52:15 53:14
   54:20,20,23,25
   55:3,5 56:11,22
   57:7
cooling 54:21,22
copies 15:15,17
   37:11 58:23
copy 15:12,13 16:5
   16:8 17:23 18:15
   24:13 25:15 26:12
   29:21 31:12,12
   41:11 52:9,17
   58:23
corporation 1:8
   5:13
correct 5:2,3,13,14
   5:24 6:3,12 7:18
   8:15 11:3,4,10,19
   12:5,11 13:3 14:8
   14:21,22,24 15:22
   16:4,5,12 17:19
   19:7,8,10 21:12

21:13 22:5,23
   23:6,10,11 24:9
   25:6 26:16 27:5
   28:17,18 29:3,4,9
   29:10 31:14,16,17
   31:19,22,23 32:1
   32:2,14,15,17
   33:13,14,15,16,18
   34:14,15,19,20,24
   36:1,2,9,10,15,16
   36:19,21 37:23,24
   38:2 40:7 42:4,5,9
   42:10,12,13,15
   43:24 44:2,3,6,7
   45:15 46:9,21,24
   46:25 47:3,19
   48:6,8,17,21
   49:22 50:8,16,17
   51:1 52:8 53:25
   54:1,5,6,12,13
   55:3,4,13,20,21
   57:7 60:8
correspondence
   7:22
counsel 60:13,14
COUNTY 59:1
   60:3
couple 22:18 42:14
course 7:20
courses 7:10
court 1:1 45:6
   58:20
co-mingled 32:16
co-signer 10:16
   21:12,14,16
create 38:1
credit 10:14 11:18
   11:20,21,23,24,25
   12:1,2,4,7,10,13
   13:2,5,10,16 14:5
   14:7,14 17:5,8
   19:4,18,19,23
   20:1,2,10 21:7,22
   21:23,23 22:1
   23:12,13,15,19
   24:3,4,14,18

30:15,16 42:3,9
   51:22 56:24 57:1
   57:6
creditor 16:11
   17:10,13
Crest 27:4
criteria 13:11 14:13
Crossier 58:2
customer 8:11,14
   16:19,24,25 20:3
   21:6,6 26:8,16
   39:23 40:8 46:18
   46:20 51:24 52:2
   52:4
customers 25:18
customer's 42:3,9
   57:6
C.P.S 17:11 22:3,9
   22:13 24:4,18,19
   29:25 30:3,9,21
   31:7 42:2 51:18
   56:16 57:5

——————————
          D
——————————
D 3:1
damage 47:2
date 30:25
dated 28:4
dates 33:1
day 11:13,15 18:22
   27:13,14,23,23
   54:18 59:9 60:16
day-to-day 38:7
deal 10:18 24:22
   30:12 42:20 43:8
   43:10
dealer 7:1,3,6,8
   11:14 19:15 35:23
   46:17 47:6 51:8
   52:4
dealership 9:22
   10:1,7,22 11:9,12
   11:17,22 12:3,12
   12:13,19,21 13:4
   13:6,8,9 18:25
   19:14 21:18,19

23:8 24:2 25:18
   26:8 27:4 32:12
   33:10,12 35:2,5
   35:10 36:18 38:12
   39:13 40:20,24
   41:1 43:16 46:19
   46:24 47:7,17
   48:21 49:11 51:12
   58:4
dealerships 22:14
dealership's 55:10
dealer's 7:5
dealt 58:7,8
deceptive 39:7,11
   39:15,21 40:10
decided 30:10
decision 12:13 14:6
   19:6,9,13
Defendant 1:10 2:5
delivered 27:11
   48:23
demonstrate 45:3
denied 19:22 30:15
   30:15 40:19
denies 20:2
deny 20:1 50:2
Depending 16:17
depicted 24:11
deposition 1:17 3:3
   3:16 4:2,19,21 5:8
   14:20 28:11 58:24
   60:7,9,10,11
described 48:20
difference 42:16
   45:3,12
differences 54:3
different 33:1
   40:20 41:2 42:8
DIRECT 3:12
director 12:15,16
directors 6:18
disclosed 57:17
   58:14,16
disclosure 46:3
   47:11 58:2,13
discuss 7:22 10:23

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez
Page 63

discussed 41:5
discussion 11:2
discussions 29:1
display 47:12
displayed 11:8,11
dispute 38:13
DISTRICT 1:1,1
DIVISION 1:2
DMV 7:5
document 16:1,6,8
  17:2,8,18 25:23
  26:20,22 29:18
  31:3 32:21 34:12
  35:5,13 36:17,20
  37:1,17 38:8,23
  39:8,11,14,17,25
  51:14 55:14 56:13
documents 20:15
  28:3,16 33:3,23
  54:3,14
doing 1:8 22:6
doubt 26:19,21
DOWNTOWN
  1:13
drive 49:6
driven 44:24
Duces 14:20
due 36:14 42:2 57:5
duly 3:10 59:6 60:6
dumb 26:17
duplicate 31:20
dying 49:6

_____ E _____
E 3:1,1 60:1,1
earlier 16:10
East 1:14
edification 13:22
effect 17:13
eight 7:21
either 9:4 25:4
else's 45:16
employee 60:14
employer 27:5
English 47:25 48:7
  48:8,10,13,14

enter 34:4
envelope 26:11,11
  26:14
Equifax 12:8,9
  13:16
Ernesto 1:19 3:9,15
ESQUIRE 2:2,5
evaluated 14:6
events 29:4
exact 47:15
exactly 5:19 31:25
  48:22
EXAMINATION
  3:12
examined 3:10
excuse 4:20 8:20
  35:3
Exhibit 15:25 17:3
  17:18,21 23:1,2
  23:18 24:1,7,12
  25:13,22 26:9
  27:3 28:9,20
  29:13,16,24 31:2
  32:7,23 33:5,6,17
  34:12,17,18,21,23
  37:4,5,7,14,19
  38:19,20,22 40:14
  40:25 42:12 43:9
  43:13 48:20 49:14
  50:25 51:14 52:13
  52:16,18,22,23
  53:5,24,25
EXHIBITS 2:10
Expires 59:13
  60:21
explained 25:8,8
expression 8:10
  17:12,16 21:8
extend 14:7
extended 18:21
  53:12
extracted 52:6
eye 35:16

_____ F _____
F 60:1

face 39:2,4,17
  40:13
fact 36:18 38:14
  42:14 45:18 49:2
  50:2,19 54:19
factors 19:5
Fair 13:19 19:18,19
familiar 17:12 21:8
far 37:20
fax 10:19 18:19
  21:5,8,9,10,22,22
  22:22,23 38:16
faxed 27:3 38:16
federal 7:23 34:8
  47:11,15
felt 43:7
fictitious 5:12
file 15:2 16:3,6
  22:19 32:9 46:10
  52:7,11 53:17
filed 5:17
files 28:12
final 56:10
finance 12:15,16
  18:10 19:6 20:14
  20:16,18,22 21:2
  22:10 24:5,7,13
  26:12 28:4,16
  30:9 33:4,20,21
  33:22 34:2,9 36:6
  36:22 40:21 41:6
  41:9,12,20 43:12
  51:7,13,16,17,18
  51:20,21,23,24
  52:1,14 53:9,13
  53:16,25 56:18,21
  57:9
financed 51:5,7
  54:4
financial 20:11
  34:18 41:25
financially 60:14
financing 4:8 7:24
  11:3 13:7 14:10
  14:12 16:11,20,24
  16:24 17:1 18:3,3

18:5 19:25 23:24
  23:25 24:19 29:25
  30:23,23 31:6
  33:18,25 34:16
  36:1,3 40:19,24
  41:2,7 42:23
  50:11 51:10,19
  54:16 55:7,12,15
  56:8
find 22:20 50:9
fine 28:13
finish 7:13
first 3:10 8:16 9:5
  9:23 10:7,22 15:3
  15:9 18:19 21:18
  22:22,24 23:4,17
  30:1 34:12 36:14
  40:6 43:2 53:11
  54:4 57:15,25
  60:6
five 4:12,13,14 5:20
  5:21,22
fix 30:7
Florida 1:1,8,14 2:3
  2:7 3:5 59:1,13
  60:3,6,21
followed 34:7
follows 3:11
foregoing 60:8
form 38:6 39:1,20
  44:9 54:8
forms 54:9
Fort 1:14 2:3
forth 40:25 43:12
  53:15 60:11
forwarded 20:10
front 9:16 25:19
  29:16
full 3:14
fully 3:23
further 58:20 60:10
  60:13

_____ G _____
G 3:1
generated 25:2

26:6 37:20
generic 25:2
getting 6:6
give 11:13 14:14
  22:19 37:10
given 13:15 15:7
  21:5 23:23 25:3
  25:13 26:11,20
glasses 35:17
go 8:20 14:9 22:19
  30:23 34:9
goes 24:15
going 3:23 5:8
  15:24 19:3 22:25
  23:1 25:21 28:11
  35:12 41:1,6,14
  41:22 42:23 53:6
  53:15 56:15 58:21
Gomez 8:24,25 9:5
  9:21 10:1,5,20
  11:5,17 12:2 13:1
  14:5 19:3,12,13
  19:17 20:5,11,13
  20:17,18 21:11,14
  21:23 27:11 43:20
good 28:12
gotten 26:16
guess 16:17 38:9
  39:6 40:3 43:20
guessing 55:24
guide 48:2
guides 47:8

_____ H _____
half 41:8,9
hand 17:4 53:18
  59:8 60:16
Handing 28:8 32:5
  32:10 37:13 56:4
hands 40:1
handwriting 40:12
happen 26:17
happened 21:20
  27:9 29:6,12 30:2
  30:4,14 50:8
happy 30:6 52:2

Muro v. Hermanos Auto                     7/10/07                          Ernesto Sanchez
                                                                           Page 64

56:20
**harm** 13:25
**head** 41:21
**headache** 30:11
**heard** 17:16 22:13
**help** 18:3 23:24,25
 49:14 50:5
**helping** 41:5
**herefore** 35:18
**hereinabove** 60:11
 60:12
**hereof** 39:13,19
**hereunto** 60:16
**Hermanos** 1:8 5:9
**hide** 50:2,3
**higher** 42:11,13
**highlighted** 35:13
 35:25 39:17
**highlighter** 35:12
**history** 28:13 42:3
 42:9 57:6
**home** 25:15,18 55:2
**honor** 52:3
**honored** 31:7
**hours** 7:21

___

### I

**idea** 20:6 22:15
 27:17 44:20
**identification** 2:10
 15:25 25:22 28:20
 31:2 33:17 52:12
**identified** 51:15
**identify** 16:1 25:23
 28:21 31:3 32:23
**imagine** 40:9,15
 48:9
**important** 26:13
**imposes** 39:13
**include** 39:19
**includes** 35:18
 39:12
**including** 28:3,16
**inclusive** 60:8
**Incorporated** 5:9
**incriminating**

41:22
**Indicating** 17:25
**individual** 1:5
**inform** 41:1 43:7
 56:7
**information** 31:25
 34:4,5
**informed** 19:13
 40:23 49:21 55:15
**informing** 49:9
**initial** 9:25
**initially** 37:12
**input** 54:11
**inside** 26:14
**installment** 6:21,24
 14:24 15:2 16:2
 17:14,24 24:11
 29:17 52:14
**institution** 20:11
**insurance** 26:14
 46:16 47:4,5
**insure** 46:11
**insured** 46:23
**interest** 18:11 21:6
 34:5 41:25 42:11
 42:15 57:3
**interested** 11:6
 60:14
**interrogatories**
 57:22
**interrogatory**
 57:19
**interrupt** 47:13
**interview** 51:25
 52:1
**involved** 5:1
**involving** 4:7 5:25
**Isaacs** 13:19
**issue** 7:5
**itemization** 54:4

___

### J

**Jag** 11:7
**Jaguar** 11:7 55:16
 56:8
**Japan** 57:16

**Jesus** 8:2 35:16
**joint** 57:22
**Jonathan** 8:24 9:5
 10:1 19:3 20:4
 27:12 43:20
**Jose** 58:2
**July** 1:15 59:9
 60:16

___

### K

**keep** 31:9,11
**kept** 54:10,10
**kid** 49:5
**knew** 14:14
**know** 7:1 8:6,8,25
 9:2,10,12,13,15
 10:20 12:1 13:15
 13:18,21,25 14:3
 14:4 16:19 19:1
 19:16,20 21:10
 22:9,12 25:12,17
 26:7,23 27:22
 28:12 30:6,10,11
 31:6 35:6,11
 37:15,20 38:3
 39:6,10 40:12,15
 40:18 41:5,13
 43:21,23 44:24
 47:7 48:11 49:4
 50:4 51:9 53:20
 53:22,22 54:17
 55:24 56:20 58:12
**knowing** 14:1
**knowledge** 3:24
 12:9 13:1
**known** 58:1
**Kyoto** 57:15,15,21
 57:25

___

### L

**lady** 53:21
**language** 47:24
 54:21
**Large** 3:5 60:6
**Las** 1:14
**Lauderdale** 1:14

2:3
**law** 34:8 54:22
**laws** 7:23
**lawsuit** 5:1 57:11
**lawsuits** 5:17
**lawyer** 5:4
**leave** 26:8 49:5
**leaves** 46:17,18,24
**led** 9:11
**left** 46:12 50:6
**legal** 54:25
**lenders** 13:12 18:4
 18:6
**lending** 16:19
**Leonard** 23:8
**Leonardo** 12:17,18
 12:25 14:18 23:9
 29:11 41:3 57:12
 58:14,16
**Leonardo's** 33:11
 40:16
**letter** 30:20,22,24
 31:4,5,9,15,21
 41:4 50:4,15,25
**letters** 48:12 49:9
 49:13,20 50:10
**Letting** 31:6
**let's** 51:22 55:9
**license** 6:20,23 7:5
**liked** 9:17
**line** 7:14,20
**lines** 11:24
**listed** 58:10
**listen** 42:19
**little** 7:25 8:1 19:24
 42:13 44:22 51:2
**lives** 27:22
**living** 27:16,18
**locations** 30:9
**long** 4:10 5:15 6:4
 6:23 7:20 12:21
 24:20 44:21
**look** 14:2,3 19:1
 38:7 41:14 42:18
 44:15 47:16 53:6
 55:9 57:24 58:12

**looked** 13:24 38:23
**looks** 13:10 15:5
 37:16 49:18
**lot** 36:23 48:16,22
 49:5 58:18
**loud** 35:14,15
**Lourdes** 1:5 6:1 8:6
**low** 10:14 42:2 57:4
**lower** 42:1 57:3
**lying** 52:2

___

### M

**making** 51:8
**man** 12:14 57:13,14
**mandatory** 58:1
**Maria** 12:17,18
 33:11 57:12 58:14
 58:16,19
**mark** 15:18,19
 22:25 28:9,13
**marked** 15:24 17:2
 23:2 25:21 28:19
 31:2 52:12
**MARLA** 3:3 59:12
 60:5,20
**matter** 38:7 50:2
 54:19
**mean** 6:9 8:11
 11:20 13:6 16:18
 18:9 38:21 51:6
 52:20
**means** 35:6 36:11
 53:19
**mechanical** 30:7
**memory** 27:25
 31:15
**mentioned** 4:2 9:15
 16:10 27:18
**met** 9:4 10:23
**Miami** 1:2 2:7
**mile** 45:11
**mileage** 45:3 46:3
**miles** 45:1,19,21,22
**mind** 15:18 53:21
 55:1
**mine** 48:14

minus 50:1
minute 14:13
mistake 8:14
mistaken 41:3
    44:22 45:20
moment 55:9
money 16:19 43:21
month 41:8,8,8
    44:25
monthly 36:15
    42:16 43:2
months 44:23 45:14
motor 11:16
Muro 1:5 6:1 8:6
    9:4 10:17 17:19
    18:16 21:17,18,21
    22:16,21 23:5
    24:12 25:13 26:20
    28:2,15 29:12
    30:5,19 31:4 32:4
    32:25 35:1,4
    40:19,21,23 41:1
    41:4,5,16 42:20
    43:1,7,15,20,22
    44:4,21 45:24
    46:11 49:9,10,17
    49:23 50:15 55:15
    56:6,7
Muro's 21:24
MURPHY 2:2 3:13
    13:22 14:2 15:10
    25:5 32:20

_____
N
N 3:1
name 3:14 4:23
    5:12 8:23 10:17
    12:16 47:15 57:14
    57:15,16,16,20,25
    57:25
names 57:10
national 12:6
need 10:16
needed 18:21 21:12
negotiations 53:14
Neither 54:14

never 17:16,17,19
    25:5
new 41:15
North 2:7
Northeast 2:6
Notary 3:4 59:13
    60:21
notes 28:5,7,14,24
    28:25 29:7 41:18
    41:24 42:3 56:3
    56:23,23,25 60:9
notice 14:20 19:12
    19:15,16,22 20:3
    20:14 30:18 49:16
    55:1 58:13
number 5:24 40:12
    50:6
numbered 60:8
numbers 41:20
    53:13 54:12

_____
O
O 3:1
Object 44:9
obtain 50:11
obtained 21:14
    42:1 57:4
obtaining 23:24
obviously 28:10
    39:24 51:21
occurred 20:9 29:4
October 31:1
odometer 47:11,13
offer 18:22
offered 57:5
office 54:10 57:18
officers 6:13
official 59:8
Oh 49:3
Okay 4:1 18:14
    20:24
Olas 1:14
old 8:5,25 9:2 10:20
older 39:4
Once 4:4 55:18
Opportunity 19:19

option 23:23
order 7:4 14:13
    15:3 18:16,23
    19:25 22:17 23:4
    23:18 24:3,14,15
    24:18 25:24 26:12
    27:2 32:24,24
    33:24 34:2,3,6,19
    34:25 35:17,19,22
    39:2,5,18 46:15
    53:11,11,12 55:17
    55:18,19
orders 22:21 25:19
    32:3 34:13 36:25
original 25:25
    26:20,22 37:7,9
    37:14,16 41:23
    52:14 53:16,19
    57:5
originally 42:1 57:4
ostensibly 54:7
ownership 46:19
owns 22:9

_____
P
P 2:11 3:1
pack 21:4
page 25:12 26:3,16
    29:14 40:1,5,6,9
    54:5 56:25
pages 25:10,19 26:7
    40:7 55:20 60:8
paid 36:13
paper 22:13 38:15
papers 14:19,23
    26:25 36:24 48:19
    48:25 49:1
paperwork 26:10
    27:10,13 34:7
    36:23 48:23 51:23
    53:20
Pardon 9:1 29:15
    50:20
Park 27:4
part 13:7 16:9
    19:13,25 26:9

29:14 30:8 37:3
particular 5:25
    11:11 17:8 18:1,6
    18:7 20:2 24:22
    51:6 54:19,20
parties 22:11 36:20
    60:13
parts 55:19
party 37:23 60:14
pass 52:1
pay 35:20 51:5
payment 35:21
    36:14 43:2,15,18
    44:4,5 50:11
payments 35:21
    36:8,11,14 42:17
    51:8
people 29:1 51:22
percent 36:3
period 44:25 54:21
    54:23
person 20:2 37:18
    47:3 48:5 57:17
    58:7,8
personally 59:5
persons 19:22
    57:10
person's 11:23
pertain 54:3
phone 51:25
photocopies 58:21
photocopy 29:14
    31:9,11,18
physically 48:21
pick 48:17
place 60:11
Plaintiff 1:6 2:2
Plaintiff's 2:10
    15:25 17:3,18,21
    22:25 23:2,18
    24:1,7,12 25:13
    25:22 27:3 28:20
    29:13,16,24 31:2
    32:23 33:17 34:12
    34:17,18,21,23
    37:4,5,7,14,19

38:19,20,22 40:13
    40:25 42:12 43:8
    43:12 48:20 49:14
    50:25 51:13 52:13
    52:16,18,21 53:4
    53:24,24
plate 26:13
please 3:14 28:7
point 21:11
points 42:14
police 50:4
Portfolio 22:4,7
portfolios 22:14
portion 35:13,25
    39:18 55:22
position 5:6 51:12
    55:10
possession 50:23
    51:3,11
practice 19:21
    25:18
preparation 28:11
present 26:24 40:20
presently 12:18
president 5:7
previously 51:13
    57:17
pre-approval 41:24
price 39:3
Pride 18:3
print 26:15 37:21
printed 25:9 31:14
    39:1
printer 38:1
prints 26:7 34:6
prior 35:19
probably 12:13
problem 30:7
produced 25:5 45:5
production 45:8
Professional 3:4
    60:5
program 37:23,25
proof 26:13 46:16
proposed 41:15
protect 46:15

Muro v. Hermanos Auto                     7/10/07                          Ernesto Sanchez
Page 66

**provide** 15:1 16:20
  19:22 29:22 30:18
  41:2,9 43:15
  51:10 54:22
**provided** 19:12
  31:25 43:19 51:17
  56:6
**prudent** 38:6
**Public** 3:4 60:21
**Public-State** 59:13
**pull** 12:3
**pulled** 12:10 13:1
  14:5 19:4
**pulls** 13:4
**purchase** 10:13,15
  35:17 39:3 56:8
**purchased** 45:24
  48:3
**purchaser** 35:20
  46:7
**purchasing** 10:23
**purport** 53:25
**purpose** 18:2 31:5
  46:4
**purposes** 5:8 16:11
  31:24 34:11
**put** 26:10 40:3
**putting** 15:21
**p.m** 1:15,15 58:25

——————————
          **Q**
——————————
**qualify** 13:12 14:15
**question** 3:20,23
  7:13 16:16 20:6,8
  40:22 44:14 49:19
  56:5
**questions** 42:19
**quite** 16:13 39:16
**quizzical** 13:25
  14:2

——————————
          **R**
——————————
**R** 2:5 3:1 60:1
**ran** 11:17,20
**rate** 18:11 21:6
  34:5 41:25 42:11

42:15,24 57:3
**read** 16:15,16 17:4
  35:13 39:2,18
  54:18 55:8,22
**reading** 28:5 35:16
**realize** 13:20
**really** 58:17
**reason** 26:19,21
  37:17 38:13 53:8
  58:15
**recall** 9:25 10:11
  57:16
**receive** 39:9,15
  40:4,8,10,24
**received** 24:13
  38:12 39:21 41:25
  42:2 43:4 44:2
**recognize** 33:15
**recollection** 3:19
  9:19 20:9 29:5
**record** 3:19 13:23
  15:5,20 20:15
  34:12 35:15 39:18
**records** 19:2 20:8
  28:25 32:13,14,17
  44:15 45:2,5,9,16
  45:17 46:9
**redeem** 49:10,21
**redo** 42:20
**refer** 5:9 38:22 39:5
**reference** 36:25
  38:18,19 40:5
  52:19 54:15 55:5
**referral** 9:13
**referred** 16:16
**referring** 14:17
  56:13
**reflected** 42:12
  52:21
**reflecting** 18:24
**refresh** 27:24
**Refreshment** 7:12
**registration** 26:13
**rejected** 56:24,25
  57:7
**rejection** 30:21

**relative** 12:23
  60:13
**relied** 29:7
**rely** 41:19
**remember** 4:6,11
  4:15,23 5:19 6:2
  8:2,3,18,23 9:18
  10:3,4,5 12:6
  20:12 24:22 26:23
  27:25 34:1 41:7
  41:17 44:12,14
  46:2,3,5,8 47:15
  48:4 56:16 57:20
  57:23 58:18
**repairs** 50:1
**repeat** 3:21 40:22
  46:22
**repo** 44:16 45:4,21
  50:6 57:13,14,15
**report** 10:14 11:18
  11:20 12:4,12
  13:2,5,10 14:5
  19:4 21:7,23 45:4
  45:21 50:4 60:7
**reporter** 3:4 58:21
  59:12 60:6,20
**reporting** 1:13 12:1
  12:7 13:16 19:18
**repossess** 44:8,11
**repossessed** 44:17
  44:18,19 49:8
  50:19,21,24
**repossession** 44:16
  49:20 51:3,4
**repo'd** 45:20 50:18
**representative**
  35:24 56:16
**represented** 5:4
  51:13
**representing** 43:2
**request** 16:25 18:21
  21:23,24,24 31:7
  34:3 45:8,10
  48:24 56:12,22
  57:8
**requested** 27:10

49:25 53:12
**requesting** 50:10
  51:8
**require** 46:23
**required** 7:16 34:8
  46:11,16 47:12,18
**requirements** 19:18
**rescind** 35:1,4,6
**resolved** 4:17
**respect** 20:4 42:15
**response** 14:19
**responsibility** 47:2
  47:5
**rest** 36:23
**result** 11:1
**retail** 6:21,23 14:24
  15:1 16:2 17:14
  17:23 24:10 29:17
  52:14
**return** 50:1
**returned** 56:22
**reverse** 29:18,19,20
  29:23 37:18,19
  38:1,2,13,14,18
  38:20,23 39:5,8
  39:20,22,25 40:2
  52:7 53:4 54:7
**review** 53:3
**reviewed** 19:5
**right** 3:25 10:25
  14:25 15:23 17:4
  17:11 41:21,21
  47:8 49:10,21
  56:20
**ROBERT** 2:2
**Rule** 26:10 58:13
**run** 10:13 12:8
  21:22
**runs** 51:24

——————————
          **S**
——————————
**S** 3:1,3 59:12 60:5
  60:20
**sale** 34:14 52:15
  54:23 55:7,11,15
**sales** 14:24 54:15

55:2
**salesman** 58:3
**salespersons** 58:6
**Sanchez** 1:19 3:9
  3:15
**save** 50:13
**saved** 31:15
**saying** 14:17 15:11
  39:24
**says** 39:1,4,12,18
  55:6,18,22,25
**schedule** 35:22
  57:23
**school** 7:1,3,4,6,8
**score** 10:14 13:11
  13:14,15,17 14:6
  19:4
**seal** 59:8
**second** 25:12 29:13
  32:24 33:19 40:1
  40:4,8 41:6,9,12
  53:12
**see** 8:19 15:20
  16:17 27:24 28:7
  37:19 38:16 50:5
  50:9 52:2 56:2
**seen** 9:16
**sees** 13:11
**sell** 22:10 45:23
  46:1,6
**seller** 6:21,24 17:5
  17:9,10,13 54:24
**selling** 4:8 14:11
  23:23
**seminars** 7:11
**send** 21:4 23:12
  25:18 43:1,6 49:9
  49:13 50:3,6 52:4
**sending** 41:4
**sends** 20:3
**sent** 20:15 21:21,25
  22:1 23:7,10
  24:18 25:10 30:20
  30:22,24 31:4,10
  31:12,19,22 33:20
  33:21,22 34:1

44:4,5 49:16,20
49:23 50:10,15,25
**separate** 25:9 26:7
**September** 8:22 9:6
10:7 11:23 27:7
27:14 28:1,14
47:17 54:9
**Services** 22:4,7
**set** 40:25 43:12
60:11,12,16
**Shack** 1:9 5:1,4,6
5:10,12,15,18
6:14,20 8:14,16
9:10,17,20 10:6
14:7,10,11 16:10
16:18 17:7,9,10
19:9,21 28:2,15
30:18 43:1,4,7
44:5,5,8 45:23
46:12 50:14,25
57:11
**shaky** 51:22
**shareholders** 6:16
**she'll** 50:2
**shorthand** 3:4 60:5
60:9
**show** 15:24 23:1
25:21 28:19 52:6
**showed** 38:11
**showing** 31:1 52:11
**shown** 35:22 37:3
**side** 4:24 17:4
29:18,19,20,23
37:18,19 38:1,2
38:13,15,18,20,23
39:5,8,20,22,25
40:2 52:7 53:4
54:7
**sides** 37:21 38:8
**sign** 20:13,21 21:2
21:22 22:16 27:13
34:8 48:22
**signature** 23:7
25:25 33:8,9,11
33:15
**signed** 12:2 15:4

17:19,23 18:19,25
20:18 22:18,21,22
23:4 24:1,12 27:2
27:10 28:3,15
29:12,24 30:1
31:19 32:3,12,22
32:25 33:12,23
34:13,19 36:18,21
38:9,15,17 39:23
40:9,11 48:19,21
48:25 49:1 51:23
53:9,14 54:23
**signing** 26:24
**signs** 15:9 37:19
**simply** 54:25
**sir** 3:14 52:24
**sit** 54:17
**slang** 3:22
**Sobel** 2:5 5:5 7:13
8:12 13:8,18,24
15:5,11,14,17,19
24:24 25:3,7 28:9
30:25 32:18 33:1
35:6,14 37:11
42:18 44:9 50:14
52:10 53:19 55:25
57:19 58:17,22
**sold** 45:18
**solicitation** 55:2
**son** 8:21 9:4 27:11
48:17,23
**son's** 8:23
**soon** 24:17
**sorry** 8:13,13 13:24
13:24 47:13
**sort** 7:10 11:2
**Southeast** 2:3
**SOUTHERN** 1:1
**so-called** 23:17
**Spanish** 47:25 48:1
48:5,8,14
**speaks** 48:5,7,8
**spoke** 21:19 48:13
**standard** 18:22
**started** 30:5
**state** 3:5,14 7:23

45:22 54:21 59:1
60:3,6,21
**statement** 16:12
29:4 42:6
**statements** 29:10
**STATES** 1:1
**stating** 30:22
**stenotype** 60:8
**stepped** 10:17
**sticker** 15:21
**stickers** 47:18,20
**store** 9:17
**Street** 2:6
**strike** 8:19
**submit** 19:25
**submitted** 24:3
30:3,4 33:3
**subpoena** 56:15
**substantially** 31:21
**substitute** 40:6
**Suite** 2:6
**supercedes** 35:19
**sure** 20:23 28:8
41:22
**sworn** 3:10 59:6
60:7
**system** 34:5

--- **T** ---

**T** 60:1,1
**take** 7:4,20 35:12
51:11 55:9
**taken** 3:3,16 60:11
**talk** 8:1
**talking** 58:18
**Tampa** 10:18
**technology** 38:4
**Tecum** 14:20
**tell** 19:24 20:13
21:5,19 24:23,25
41:21 42:22 48:13
55:10
**temporary** 26:13
**term** 18:12 42:2
**terms** 9:11 18:8,9
18:10,10 23:18

33:18,25 34:16
35:18,25 36:3
39:12,19 40:21,25
41:2,11,15 42:8
43:12 54:8 56:7
57:5
**testified** 3:11
**testify** 60:7
**testifying** 29:7
**testimony** 24:10
**Thank** 49:15
**thing** 51:3 55:8
**things** 7:22
**think** 15:7 27:18
29:22 36:12 39:7
39:11 50:13 52:18
57:21
**thinking** 56:10
**third** 22:11 37:23
**thirty** 11:15 18:22
**thought** 13:25
58:17,18
**three** 12:1,6 15:8
44:23,25 45:14
**time** 10:9,11,18,22
20:21,25 21:2,5
23:13 24:17 27:16
34:16 44:10 46:18
50:13 60:11
**times** 4:3 56:17
**title** 28:3,16 46:4
**today** 14:20 29:8
**told** 10:6 14:12
15:6 21:11 53:10
56:17
**top** 17:2 27:4
**total** 35:21 36:11
**tractor** 6:11
**trade-in** 52:19,21
53:1
**trailer** 6:11
**transaction** 48:9
**transcription** 60:9
**transfers** 22:14
**transmission** 11:16
**transport** 6:8,9

**Transporting** 6:10
**Tried** 10:13
**true** 16:5 29:3 42:6
60:8
**trust** 14:23
**truth** 60:7
**try** 9:22 41:7 42:23
50:4
**two** 5:23,24 7:16
8:4 15:8 16:9
18:24 29:6 33:23
37:21 41:8 54:3
55:18,20
**type** 4:5 11:5
**typically** 12:25
**T.O.T** 36:8,11

--- **U** ---

**Uh-huh** 27:8
**underneath** 15:22
**undersigned** 59:4
**understand** 3:20
16:14 39:16
**understanding**
21:1
**Understood** 5:10
**UNITED** 1:1
**unknown** 57:25
**unsigned** 32:11
33:7
**usage** 3:22
**use** 3:21 13:12,19
**uses** 38:6
**usually** 12:8 24:15

--- **V** ---

**vehicle** 9:16,22
10:13,15,24 11:3
11:5,8,11 13:13
14:15 19:7 27:11
30:6 34:4 44:8,11
44:21,24 45:19,19
45:20,23 46:1,11
46:12,17,19,20,23
47:1,2 48:2 49:6,7
49:8,10,21,25

Muro v. Hermanos Auto                    7/10/07                    Ernesto Sanchez
Page  68

50:3,11,16,18,21
50:22,23,24 51:4
51:9,11 52:3
56:18,19,21
**vehicles** 4:8,8 6:10
7:24 16:11 23:23
**verbal** 19:15,16
35:20
**version** 22:23 23:17
31:13,18 32:8,11
32:12 38:11 48:1
**virtue** 43:8
**visit** 9:25
**vs** 1:7

---
**W**
---

**W** 2:2
**Wait** 24:24
**waive** 58:23
**want** 24:25 28:13
29:23 30:12 47:15
49:24 56:19,21
**wants** 23:24 40:7
**warranties** 11:12
**warranty** 11:13,15
18:20,21,22,24
30:8 47:14,14
53:13
**wasn't** 25:3 27:1
30:6,15 31:18
51:6 56:20 57:7
58:14
**way** 15:3 24:15
29:13 40:3,5
52:10 56:9
**went** 41:18 42:14
48:16
**weren't** 26:24
28:10
**We'll** 50:1 52:9
58:22
**we're** 7:16 23:22
47:11 52:2 56:15
**WHEREOF** 60:16
**Wholesalers** 1:8
5:9

**window** 47:18,20
**windows** 47:12
**wish** 17:1
**witness** 24:23 59:5
59:8 60:6,16
**witnesses** 57:11
**words** 3:22 15:8
**work** 12:18 16:23
28:3,16
**worked** 12:21
27:21
**working** 10:18
56:19 58:4
**works** 27:20
**wouldn't** 9:18
14:15,15 20:12
21:10 22:12 26:16
35:11 38:10 39:6
39:10 40:15,18
43:23 44:12 46:8
49:5 53:22 54:17
**wrecked** 47:1
**writing** 19:22 20:3
30:24
**written** 35:20

---
**Y**
---

**year** 7:17
**years** 4:12,13,14
8:4,4 12:22 29:6
39:4
**years,beginning**
7:17

---
**$**
---

**$10** 42:16
**$20** 30:8
**$23,989.20** 36:9
**$399.82** 36:14 43:2
44:4
**$5** 42:16
**$5000** 43:20 44:1
**$8,227.38** 36:6

---
**0**
---

**06-33** 1:3

---
**1**
---

**1** 2:11 15:25 17:3
17:18,21 24:8,12
29:13,16,24 33:6
34:17 48:20 51:14
52:16,18,23 53:5
53:24 60:8
**1:30** 1:15
**10** 1:15
**10,000** 45:1,11
**10-17-05** 36:14
**11-inch** 29:17
**1212** 2:3
**13th** 31:1
**15** 2:11 27:7
**15th** 27:15 33:2
**16th** 59:9 60:16
**163rd** 2:6
**17** 12:22
**17th** 28:1,14 33:1
**17.950** 36:3
**18** 39:3
**1990** 5:16 6:5 7:9
**1991** 6:25

---
**2**
---

**2** 2:12 23:1,2,18
24:1 25:13 27:3
33:6,10 34:12,18
34:22 37:4 56:25
**2nd** 2:3
**2002** 11:7
**2005** 8:17,21,22 9:6
10:4,7 11:23 27:7
47:17 54:9
**2007** 1:15 59:9
60:16
**2020** 2:6
**22311-CIV-SEIT...**
1:3
**23** 2:12
**25** 2:13
**26** 58:13
**28** 2:14

---
**3**
---

**3** 2:13 25:22
**3:15** 1:15 58:25
**30** 11:13
**300** 2:6
**31** 2:15
**32** 2:16
**33162** 2:7
**33316** 2:3
**337** 1:14
**399.82** 40:13

---
**4**
---

**4** 2:14 28:20
**47** 8:4
**49** 2:17

---
**5**
---

**5** 2:15 31:2 33:17
**52** 2:18
**55,244** 45:19

---
**6**
---

**6** 2:16 32:23 34:21
34:23 37:5,8,15
37:19 38:19,20,22
40:14,25 42:12
43:9,13 48:20
**60** 36:14 40:13
**60,000** 45:21
**61** 60:8

---
**7**
---

**7** 2:17 49:14 50:25

---
**8**
---

**8** 2:18 52:13,22,23
53:19,25

---
**9**
---

**9-17** 28:2
**9-17-05** 28:4
**9-26-08** 59:13 60:21
**9-30-2005** 41:24
**9-30-2007** 42:1 57:4

# RETAIL INSTALLMENT SALE CONTRACT
## SIMPLE FINANCE CHARGE

Dealer Number _____     Contract Number _____

| Buyer (and Co-Buyer) Name and Address (Including County and Zip Code) | Creditor - Seller (Name and Address) |
|---|---|
| LOURDES MURO<br>8847 NW 151 ST TERR<br>HIALEAH FL 33018<br>Buyer's Month of Birth:   **February** | "THE CAR SHACK"<br>930 EAST 49 ST<br>HIALEAH     FL     33013 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis at the Base Rate of 17.95 % per year. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Weight (lbs.) | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| USED | 2002 | JAGUAR X-TYPE | | SAJEA51C42WC31867 | [X] personal, family or household<br>[ ] business<br>[ ] agricultural      [ ] |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $5042.00 is |
|---|---|---|---|---|
| 17.95 % | $ 8,227.37 | $ 15,761.83 | $ 23,989.20 | $ 29,031.20 |

**Insurance.** You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest insurance is checked below. Your decision to buy or not buy other insurance will not be a factor in the credit approval process. Your choice of insurance providers will not affect our decision to sell you the vehicle or extend credit to you.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 60 | 399.82 | Monthly beginning 10/17/2005 |

Or As Follows: _____

**Late Charge.** If payment is not received in full within ___10___ days after it is due, you will pay a late charge of ___5___ % of the part of the payment that is late.

**Prepayment.** If you pay off all your debt early, you may have to pay a penalty.

**Security Interest.** You are giving a security interest in the vehicle being purchased.

**Additional Information:** See this contract for more information including information about nonpayment, default, prepayment penalties, any required repayment in full before the scheduled date and security interest.

### Check the insurance you want and sign below:
**Optional Credit Insurance**

[ ] Credit Life:   [ ] Buyer  [ ] Co-Buyer  [ ] Both

Term _____

[ ] Credit Disability (Buyer Only)

Term _____

Premium:

Credit Life $ _____ N/A _____

Credit Disability $ _____ N/A _____

Insurance Company Name _____

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not to buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance may not cover any increase in your payment or in the number of payments.

If the box above is checked to indicate that you want credit life insurance, please read and sign the following acknowledgments:
1. You understand that you have the option of assigning any other policy or policies you own or may procure for the purpose of covering this extension of credit and that the policy need not be purchased from us in order to obtain the extension of credit.

X _____   09/17/05
Buyer                                            Date

X _____   N/A
Co-Buyer                                      Date

2. You understand that the credit life coverage may be deferred if, at the time of application, you are unable to engage in employment or unable to perform normal activities or a person of like age and sex. (You need not sign this acknowledgement if the proposed credit life insurance policy does not contain this restriction.)

### ITEMIZATION OF AMOUNT FINANCED

1  Cash Price (including $ 1,228.03 sales tax) ........... $ 18,528.53 (1)

2  Total Downpayment =

Trade-In _____

(Year)      (Make)              (Model)

Trade-In _____

(VIN)

Gross Trade-In Allowance           $ 0.00

Less Pay Off Made By Seller        $ 0.00

Equals Net Trade In                     $ 0.00

+ Cash                                        $ 5,042.00

+ Other                                       $ N/A

(If total downpayment is negative, enter "0" and see 4I below)   $ 5,042.00 (2)

3  Unpaid Balance of Cash Price (1 minus 2)                $ 13,486.53 (3)

4  Other Charges Including Amounts Paid to Others on Your Behalf
(Seller may keep part of these amounts):

A  Cost of Optional Credit Insurance Paid to Insurance Company or Companies.

Life                 $ N/A

Disability         $ N/A                         $ N/A

B  Vendor's Single Interest Insurance Paid to Insurance Company   $ N/A

C  Other Insurance Paid to Insurance Company or Companies   $ .00

PENGAD-Bayonne, N. J.

EXHIBIT (Plaintiff's) 1-01-7

Government Documentary Stamp Taxes

F  Government License and Cash Price $20.00
G  Government License and/or Registration Fees

H  Government Certificate of Title Fees $ 0.00
I  Other Charges (Seller must identify who is paid and $ N/A
describe purpose)

| to | for Prior Credit or Lease Balance | $ N/A |
| EXTENDED CARE P Extended Serv. Plan | | $2,000.00 |
| to | for | $ N/A |
| to | for VSI | $ N/A |
| to | for N/A | $ 0.00 |
| to | for | $ N/A |
| to | for | $ N/A |
| to | for | $ N/A |

Total Other Charges and Amounts Paid to Others on Your Behalf $2,275.30 (4)

5  Loan Processing Fee Paid to Seller (Prepaid Finance Charge) $ 0.00 (5)

6  Amount Financed (3 plus 4) $15,761.83 (6)

Payment Schedule 60 installments of $ 399.82 each, monthly beginning 09/17/2005
or as follows

3. You understand that the benefits under the policy will terminate when you reach a certain age and affirm that your age is accurately represented on the application or policy.

X ____ 09/17/05
Buyer                Date

X ____ N/A
Co-Buyer             Date

**Other Insurance**

☐ ____ Type of Insurance    Term

Premium $ ____

Insurance Company Name ____

Home Office Address ____

I want the insurance checked above.

X ____
Buyer Signature      Date

X ____
Co-Buyer Signature   Date

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. **You may choose the insurance company through which the VSI insurance is obtained.** If you elect to purchase VSI insurance through the Creditor, **the cost of this insurance is** $ ____ and is also shown in Item 4B of the ITEMIZATION OF AMOUNT FINANCED. The coverage is for the initial term of the contract. "You authorize us to purchase Vendor's or Lender's Single Interest Insurance.

Buyer: ____ Co-Buyer: ____ Date: ____

**LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED IN THIS CONTRACT.**

Returned Check Charge: If any check or order of payment you give us is dishonored, you will pay a charge if we make demand that you do so. The charge will be $25 if the check amount is $50 or less; $30 if the check is over $50 but not more than $300; $40 if the check amount is over $300, or such amount as permitted by law.

OPTION: ☐ You pay no finance charge if the amount financed, item 6, is paid in full on or before ____, Year ____. SELLERS INITIALS ____

**NO COOLING OFF PERIOD**
**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

HOW THIS CONTRACT CAN BE CHANGED. This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding. Buyer Signs X ____ Co-Buyer Signs X ____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.
See back for other important agreements.
NOTICE TO THE BUYER: a) Do not sign this contract before you read it or if it contains any blank spaces. b) You are entitled to an exact copy of the contract you sign. Keep it to protect your legal rights.

You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it.

Buyer Signs X ____ Date 09-17-05  Co-Buyer Signs X ____ Date 09-17-
Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X ____ Address ____
Seller signs ____ Date 09-17-05 By X ____ Title ____

Seller assigns its interest in this contract to ____ (Assignee) under the terms of Seller's agreement(s) with Assignee.
☐ Assigned with recourse  ☐ Assigned without recourse  ☐ Assigned with limited recourse

Seller ____ By ____ Title ____

# "THE CAR SHACK"

930 EAST 49 ST HIALEAH, FL 33013  (305) 685- 1717

## BILL OF SALE

BUYERS. LOURDES MURO .
8847 NW 151 ST TERR  HIALEAH, FL 33018 PHONE: 305 698 6884
BUYER DOB: 02/11/1960 SS: 591633648 DL :

STOCK NUM: 0531867
ACCT NUM: 0531867
SALESMAN:
DELV DATE: 09/15/2005

I HEREBY OFFER TO PURCHASE FROM YOU (ONE)
USED 2002 JAGUAR X-TYPE 4 DOOR SEDAN Vin: SAJEA51C42WC31867 MILEAGE: 55,244

_ AC  _ PS  _ PB  _ PW  _ PS  _ AB  _ Cruise  _ 4x4  _ Diesel  _ Radio  X Auto

| | | | | |
|---|---|---|---|---|
| Trade Allowance | 0.00 | SELLING PRICE | | 14,900.00 |
| Pay Off on Trade | 0.00 | **PREDELIVERY FEE | | 799.00 |
| Net Trade ( Balance after Pay Off) | 0.00 | MISC | | 0.00 |
| Trades: | | EXTENDED WARRANTY | | 0.00 |
| | | LESS USED CAR ALLOWANCE | | 0.00 |
| | | SUBTOTAL | | 15,699.00 |
| | | STATE SALES TAX | 6.00% | 941.94 |
| | | COUNTY TAX | 1.00% | 50.00 |
| | | OTHER TAX | 0.00% | 0.00 |
| | | TAG / XFER | | 220.00 |
| INS NAME: | EFF. DATE. | MVWFT/TIRE/BATTERY FEES | | 0.00 |
| POLICY: | EXP DATE. | AMT. OWED ON TRADE | | 0.00 |
| | | SUBTOTAL | | 16,910.94 |
| APR  FINANCE CHARGE  TOT PAYMENTS | | PARTIAL DOWN | | 5000.00 |
| 0.00%  0.00  0.00 | | BALANCE OF DOWN | | 0.00 |
| THE BALANCE IS TO BE PAID IN 1 PAYMENT OF $11,910.94 DOLLARS. | | TOTAL CASH DOWN | | $5,000.00 |
| | | UNPAID BALANCE | | $11,910.94 |

PURCHASER (BUYER) AGREES THAT THIS ORDER INCLUDES ALL OF THE TERMS AND CONDITIONS HEREFORE, THAT THIS ORDER CANCELS AND SUPERCEDES ANY PRIOR AGREEMENT WRITTEN OR VERBAL. PURCHASER AGREES TO PAY THE TOTAL OF PAYMENTS IN ACCORDANCE WITH THE PAYMENT SCHEDULE SHOWN ABOVE  THIS ORDER SHALL NOT BECOME BINDING UNTIL ACCEPTED BY THE DEALER OR HIS OR HER AUTHORIZED REPRESENTATIVE.

NOTICE. DEALER PROVIDES NO INSURANCE BUYER AGREES TO FURNISH FULL COVERAGE INSURANCE.

[ ] I RELINQUISH ALL RIGHTS TO THIS VEHICLE AND IT CAN BE REPOSSESSED AT ANY TIME OR PLACE, WITH OR WITHOUT MY KNOWLEDGE SHOULD THIS ACCOUNT BECOME DELIQUENT.

[ ] SOLD AS IS: I MAKE THIS PURCHASE KNOWINGLY WITHOUT ANY GUARANTEE, NEITHER EXPRESSED NOR IMPLIED, BY THIS DEALER OR HIS AGENT. I AGREE TO NOTIFY THE LIEN HOLDER, IF (A) CHANGE OF ADDRESS  OCCURS (B) CHANGE OF EMPLOYMENT OCCURS.

[ ] ALL SALES FINAL, NO RETURNS NO REFUNDS. MILEAGE MAY BE OVER, OR NOT ACTURAL MILEAGE. SELLER NOT RESPONSIBLE FOR MILES

I HAVE READ THE FACE OF THIS ORDER AND AGREE TO THIS PURCHASE PRICE. I HEREBY CERTIFY THAT I AM 18 YEARS OF AGE OR OLDER.

** Note: PREDELIVERY FEE Represents cost and profit to the seller/dealer for the items such as inspecting, cleaning and adjusting the new and used vehicles as well as preparing documents related to the sale.

_____   9-15-05
LOURDES MURO            DATE          _____  DATE

_____   _____  LIEN TO:
DEALER'S AGENT         DATE

EXHIBIT
Plaintiffs 2
7-10-07 MM

## AGREEMENT

The words "you," "your" and "yours" mean each person submitting this application. The words "we," "us," "our" and "ours" as used below refer to us, the dealer, and to the financial institution(s) selected to receive your application.

You authorize us to submit this application and any other application submitted in connection with the proposed transaction to the financial institutions disclosed to you by us the dealers. This application will be reviewed by such financial institutions on behalf of themselves and us the dealer. In addition, in accordance with the Fair Credit Reporting Act, you authorize that such financial institutions may submit your applications to other financial institutions.

You agree that we may obtain a consumer credit report periodically from one or more consumer reporting agencies (credit bureaus) in connection with the proposed transaction and any update, renewal, refinancing, modification or extension of that transaction. You also agree that we or any affiliate of ours may obtain one or more consumer credit reports on you at any time whatsoever. If you ask, you will be told whether a credit report was requested, and if so, the name and address of any credit bureau from which we or our affiliate obtained your credit report.

You agree that we may verify your employment, pay, assets and debts, and that anyone receiving a copy of this is authorized to provide us with such information. You further authorize us to gather whatever credit and employment history we consider necessary and appropriate in evaluating this application and any other applications submitted in connection with the proposed transaction.

We may keep this application and any other application submitted to us and information about you whether or not the application is approved. You certify that the information on the application and in any other application submitted to us, is true and complete. You understand that false statements may subject you to criminal penalties.

## FEDERAL NOTICES

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## STATE NOTICES

**California Residents:** An applicant, if married, may apply for a separate account.

**Ohio Residents:** Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

**New Hampshire Residents:** If this is an application for balloon financing, you are entitled to receive, upon request, a written estimate of the monthly payment amount that would be required to refinance the balloon payment at the time such payment is due based on the creditor's current refinancing programs.

**New York Residents:** In connection with your application for credit, we may request a consumer report which contains information on your credit worthiness, credit standing, personal characteristics and general reputation. If we grant you credit, we or our loan servicer may order additional consumer reports in connection with any update, renewal or extension of the credit. If you ask us, we will tell you whether we obtained a consumer report and if we did, we will tell you the name and address of the consumer reporting agency that gave us the report.

**Vermont Residents:** By signing below you authorize us and our employees or agents to obtain and verify information about you (including one or more credit reports, information about your employment and banking and credit relationships) that we may deem necessary or appropriate in evaluating your loan application. If your application is approved and the loan is made, you also authorize us, and our employees and agents, to obtain additional credit reports and other information about you in connection with reviewing the account, increasing the available credit on the account (if applicable), taking collection on the account, or for any other legitimate purpose.

**Married Wisconsin Residents:** Wisconsin law provides that no provision of any marital property agreement, or unilateral statement, or court order applied to marital property will adversely affect a creditor's interests unless, prior to the time that the credit is granted, the creditor is furnished with a copy of the agreement, statement or decree, or has actual knowledge of the adverse provision. If you are making this application individually, and not jointly with your spouse, the full name and current address of your spouse must be properly disclosed in the co-applicant section of this application.

This application may be submitted to the following financial institutions [Name(s) and Address(es)] _____

---

| BY SIGNING BELOW, YOU CERTIFY THAT YOU HAVE READ AND AGREE TO THE TERMS AND DISCLOSURES ON THE THREE PAGES OF THIS APPLICATION. |

X _____       _____       X _____       _____

       APPLICANT'S SIGNATURE              DATE                  CO- APPLICANT'S SIGNATURE           DATE

COPYRIGHT (C) 2001 DEALERTRACK, INC. ALL RIGHTS RESERVED.

# "THE CAR SHACK"

930 EAST 49 ST HIALEAH, FL 33013  (305) 685- 1717

BUYERS:  LOURDES  MURO ,
8847 NW 151 ST TERR  HIALEAH. FL 33018 PHONE: 305 698 6884
BUYER  DOB:  02/11/1960  SS: 591633648  DL :
COBUYER DOB:  SS:  DL :

STOCK NUM: 0531867
ACCT NUM: 0531867
SALESMAN:
DELV DATE: 09/17/2005

I HEREBY OFFER TO PURCHASE FROM YOU (ONE)    [X] USED    [ ] NEW
MILEAGE: 55,244                    VIN: SAJEA51C42WC31867
VEHICLE: 2002 JAGUAR X-TYPE 4 DOOR SEDAN

_ AC    _ PS  _PB    _ PW    _ PS    _ AB    _ Cruise    _ 4x4    _ Diesel    _ Radio    X Auto

| | | |
|---|---|---|
| INS NAME: | SELLING PRICE | 15,700.00 |
| POLICY: | EXTENDED WARRANTY | 2,794.00 |
| EFF. DATE.          EXP DATE. | LESS USED CAR ALLOWANCE | 0.00 |
| | **PREDELIVERY FEE | 799.00 |
| APR        FINANCE CHARGE        TOT PAYMENTS | SUBTOTAL | 19,293.00 |
| 17.950%        8,227.38        23,989.20 | STATE SALES TAX        6.00% | 1,157.58 |
| THE BALANCE IS TO BE PAID IN 60.00 PAYMENTS OF $399.82 | COUNTY TAX .        1.00% | 77.94 |
| DOLLARS.FIRST PAYMENT  IS DUE ON 10/17/2005 AND MONTHLY | OTHER TAX        0.00% | 0.00 |
| | TAG / XFER | 220.00 |
| PURCHASER (BUYER) AGREES THAT THIS ORDER INCLUDES ALL OF THE TERMS AND CONDITIONS HEREFORE, THAT THIS ORDER CANCELS AND SUPERCEDES ANY PRIOR AGREEMENT WRITTEN OR VERBAL. PURCHASER AGREES TO PAY THE TOTAL OF PAYMENTS IN ACCORDANCE WITH THE PAYMENT SCHEDULE SHOWN ABOVE. THIS ORDER SHALL NOT BECOME BINDING UNTIL ACCEPTED BY THE DEALER OR HIS OR HER AUTHORIZED REPRESENTATIVE. | MVWFT/TIRE/BATTERY FEES | 0.00 |
| | INS. PREMIUM | 0.00 |
| NOTICE: DEALER PROVIDES NO INSURANCE BUYER AGREES TO FURNISH FULL COVERAGE INSURANCE. | GAP / CAR CLUB | 0.00 |
| | DOCUMENTARY STAMPS | 55.30 |
| [ ] I RELINQUISH ALL RIGHTS TO THIS VEHICLE AND IT CAN BE REPOSSESSED AT ANY TIME OR PLACE, WITH OR WITHOUT MY KNOWLEDGE SHOULD THIS ACCOUNT BECOME DELIQUENT. | MISC | 0.00 |
| | AMT. OWED ON TRADE | 0.00 |
| [ ] SOLD AS IS: I MAKE THIS PURCHASE KNOWINGLY WITHOUT ANY GUARANTEE, NEITHER EXPRESSED NOR IMPLIED, BY THIS DEALER OR HIS AGENT. I AGREE TO NOTIFY THE LIEN HOLDER, IF (A) CHANGE OF ADDRESS OCCURS (B) CHANGE OF EMPLOYMENT OCCURS. | SUBTOTAL | 20,803.82 |
| | PARTIAL DOWN | 5042.00 |
| { } ALL SALES FINAL, NO RETURNS NO REFUNDS. | BALANCE OF DOWN | 0.00 |
| I HAVE READ THE FACE OF THIS ORDER AND AGREE TO THIS PURCHASE PRICE. I HEREBY CERTIFY THAT I AM 18 YEARS OF AGE OR OLDER. | TOTAL CASH DOWN       $5,042.00  GRAND TOTAL       $15,761.82 | |

Trades:

_____  _____  _____  _____

_____  9/17/05  _____
LOURDES MURO                      DATE                                                      DATE

_____
DEALER'S AGENT                              DATE        LIEN TO:  CPS
** Note: PREDELIVERY FEE Represents cost and profit to the seller/dealer for the items such as inspecting, cleaning and adjusting the
new and used vehicles as well as preparing documents related to the sale.

EXHIBIT
Plaintiff's 3
7-10-07 MR

09/15/2006 Jonathan came to The Car Shack in purchase of a car under his mother's name, Lourdes Muro.

Down payment received, $5000.00.  Lourdes Muro was not available to sign because she works in Tampa.  Maria at this time was trying to obtain a pre approval.  For this reason the first buyer's order signed did not have a quote for payments or a lienholder listed. To convenience her, we delivered the vehicle to her son out of her request.  We signed the preliminary buyers order, buyer's guide, title application and other documents so Jonathan can take the car.  The buyers order reflected the interest rate required by the finance company.  The documents where faxed to her and she returned them by fax too. In addition, the customer faxed a copy of her drivers license and copy of insurance card.

Why second buyer's order?  The customer wanted an extended warranty.  By this time Maria had obtained a pre approval which stated a rate and max amount financed.  The second faxed buyer's order reflected the information given by CPS.  The lienholder, CPS, was also listed.  The customers both Lourdes Muro and Jonathan were aware of a pre approval and that the finance company will contact Lourdes Muro to verify all information stated on application.  The final approval was to be given upon completion of all investigative work by the finance company.

In addition, customer agreed to return to dealer to sign all original paperwork including the finance contract within the next few days if we delivered the vehicle to her son.  We agreed.  The vehicle was delivered to Jonathan.

09/17/2006 Lourdes Muro arrived at The Car Shack and signed all documents including all title work and finance contract (Dated 09/17/2006).

09/22/2006 All documents were submitted for funding to CPS.

09/26/2006 CPS faxed a funding notice update which indicated what the finance company needed to fund the contract to The Car Shack.

09/29/2006 During the customer interview, customer (Lourdes Muro) said there were problems (mechanical) problems with the car.  CPS like any other financial institution gets worried when a customer has issues concerning the working condition of the vehicle. They returned the contract to the dealer, therefore declining the loan.  It is important to note that the customer called the finance company several times concerning the matter. Not because The Car Shack neglected to fix the problem but because the customer demanded that the vehicle be fixed at a Jaguar Dealer.  We refused because of the cost of labor.  We agreed to buy the parts from Jaguar but not pay the labor.  The customer also became upset because the part needed was backordered for two weeks.  The repairs needed to be done had a cost of $150.00.

Since the contract was returned, the contract could no longer be resend to the finance company.  We advice Lourdes of her options and gave her time to also obtain financing on her own if she preferred.

EXHIBIT
Plaintiff's 4
7-10-07 MX

Maria also started working on obtaining a different finance alternative for the customer since she knew the contract will be returned. On 09/30/2006 pre approval was received from Citifinancial. The deal was renegotiated and a new pre oval was submitted with a lower rate on 10/06/2006. The interest rate was lower than the one originally obtained on 09/30/2007 but not as low as the original terms offered by CPS due to the customer's credit history which we

Payments for pre- approval dated 10/06/2006 approximately $427 a month.

10/12/2006 Conversations were ongoing between the salesman, Maria, Ernesto and Lourdes during the entire time.  A fax cover sheet with the financing terms offered was provided to Lourdes Muro.

She returned via fax her correspondence to the offers being made.

10/13/2006 We send Mrs. Muro a letter via certified mail responding to her letter faxed and dated 10/12/2007.

10/19/2006 The customer attempted to make a payment to The Car Shack.  We returned it to her obviously stating what she already knew.

There were many phone calls with the customer, requesting that if she did not agree to sign a contract then to please return the vehicle.  We would refund the customer for clean up and any tear and any tear and wear on the vehicle.

*This DEAl Also WAS A funDing headache foR CPS because she didn't Receive AN ACTUAl PAystub from her job — she needed to log into A network and Print it out. AN Approval had to be Obtained from A Funding Supervisor In oRDer for the PAystubs to be Accepted. In Addition, customer had to fAx SEVERAl Stips needed — Which she did.

**THE CAR SHACK**
930 East 49 St
Hialeah, Fl 33013
(305) 685-1717 Fax (305) 685-5722

October 13, 2005

2002 Jaguar X-Type
SAJEA51C42WC31867

Dear Lourdes Muro;

We have received your faxed letter dated October 12, 2005. In response to your notice, the contract you signed was not funded due to the many phone calls you made insisting that the vehicle was not being fixed and that the vehicle was mechanically inoperable, when in fact what was wrong with the vehicle was a $20 part and some other issues that you are aware of.

As for the vehicle having problems, we are aware and we have never asked you to pay anything for the repairs we were making to the car. You did sign a buyer guide which stated repairs are to be made by the dealer, at our choice of mechanic and you are responsible for 50% of the total. I am stressing again, we have not ever asked you to pay half of the cost which you agreed to do. In addition, we were also willing to change the vehicle for you.

In response to the choices available to you for financing option, you may if you like sign with Citifinancial for either contract as I stated earlier but you have always had the opportunity to obtain your own financing. You are not required to use our sources. Again, Citifinancial is the only finance company that will give you another car loan when there is an existing car loan open. Please remember, that the interest rate is a composite of your credit history. The Car Shack does not "give the customer the contract rate."

As for your registration, you have a temporary tag and we have 60 days by DMV to provide you with a registration. You may come in to our office and obtain another temporary registration and to sign a contract.

We ask that you discuss your options and do what is best for you. We are only concerned with obtaining the remaining balance in accordance with the bill of sale. Therefore we are at this point requesting that within 10 working days for you to either bring us a draft or to sign a contract with Citifinancial in order to finalize this sale. We are your loss payee and lien holder until you either sign with Citifinancial or a lender which have obtained a loan from.

Sincerely,

Ernesto Sanchez
Manager



## AGREEMENT

The words "you," "your" and "yours" mean each person submitting this application. The words "we," "us," "our" and "ours" as used below refer to us, the dealer, and to the financial institution(s) selected to receive your application.

You authorize us to submit this application and any other application submitted in connection with the proposed transaction to the financial institutions disclosed to you by us the dealers. This application will be reviewed by such financial institutions on behalf of themselves and us the dealer. In addition, in accordance with the Fair Credit Reporting Act, you authorize that such financial institutions may submit your applications to other financial institutions.

You agree that we may obtain a consumer credit report periodically from one or more consumer reporting agencies (credit bureaus) in connection with the proposed transaction and any update, renewal, refinancing, modification or extension of that transaction. You also agree that we or any affiliate of ours may obtain one or more consumer credit reports on you at any time whatsoever. If you ask, you will be told whether a credit report was requested, and if so, the name and address of any credit bureau from which we or our affiliate obtained your credit report.

You agree that we may verify your employment, pay, assets and debts, and that anyone receiving a copy of this is authorized to provide us with such information. You further authorize us to gather whatever credit and employment history we consider necessary and appropriate in evaluating this application and any other applications submitted in connection with the proposed transaction.

We may keep this application and any other application submitted to us and information about you whether or not the application is approved. You certify that the information on the application and in any other application submitted to us, is true and complete. You understand that false statements may subject you to criminal penalties.

## FEDERAL NOTICES

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## STATE NOTICES

**California Residents:** An applicant, if married, may apply for a separate account.

**Ohio Residents:** Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

**New Hampshire Residents:** If this is an application for balloon financing, you are entitled to receive, upon request, a written estimate of the monthly payment amount that would be required to refinance the balloon payment at the time such payment is due based on the creditor's current refinancing programs.

**New York Residents:** In connection with your application for credit, we may request a consumer report which contains information on your credit worthiness, credit standing, personal characteristics and general reputation. If we grant you credit, we or our loan servicer may order additional consumer reports in connection with any update, renewal or extension of the credit. If you ask us, we will tell you whether we obtained a consumer report and if we did, we will tell you the name and address of the consumer reporting agency that gave us the report.

**Vermont Residents:** By signing below you authorize us and our employees or agents to obtain and verify information about you (including one or more credit reports, information about your employment and banking and credit relationships) that we may deem necessary or appropriate in evaluating your loan application. If your application is approved and the loan is made, you also authorize us, and our employees and agents, to obtain additional credit reports and other information about you in connection with reviewing the account, increasing the available credit on the account (if applicable), taking collection on the account, or for any other legitimate purpose.

**Married Wisconsin Residents:** Wisconsin law provides that no provision of any marital property agreement, or unilateral statement, or court order applied to marital property will adversely affect a creditor's interests unless, prior to the time that the credit is granted, the creditor is furnished with a copy of the agreement, statement or decree, or has actual knowledge of the adverse provision. If you are making this application individually, and not jointly with your spouse, the full name and current address of your spouse must be properly disclosed in the co-applicant section of this application.

This application may be submitted to the following financial institutions [Name(s) and Address(es)] _____

_____

| BY SIGNING BELOW, YOU CERTIFY THAT YOU HAVE READ AND AGREE TO THE TERMS AND DISCLOSURES ON THE THREE PAGES OF THIS APPLICATION. |

X _____     _____     X _____     _____
APPLICANT'S SIGNATURE                          DATE                   CO- APPLICANT'S SIGNATURE                     DATE

COPYRIGHT (C) 2001 DEALERTRACK, INC.  ALL RIGHTS RESERVED.

# *"THE CAR SHACK"*

930 EAST 49 ST HIALEAH, FL 33013  (305) 685- 1717

BUYERS: LOURDES MURO ,
8847 NW 151 ST TERR  HIALEAH, FL 33018 PHONE: 305 698 6884
BUYER  DOB: 02/11/1960 SS: 591633648 DL :
COBUYER DOB:  SS:  DL :

STOCK NUM: 0531867
ACCT NUM: 0531867
SALESMAN:
DELV DATE: 09/15/2005

I HEREBY OFFER TO PURCHASE FROM YOU (ONE)  [X] USED    [ ] NEW
MILEAGE: 55,244          VIN: SAJEA51C42WC31867
VEHICLE: 2002 JAGUAR X-TYPE 4 DOOR SEDAN

_ AC  _ PS  _ PD  _ PW  _ PS  _ AB   _ Cruise  _ 4x4  _ Diesel  _ Radio   X Auto

| | | |
|---|---|---|
| INS NAME: | SELLING PRICE | 15,700.00 |
| POLICY: | EXTENDED WARRANTY | 2,794.00 |
| EFF. DATE         EXP DATE. | LESS USED CAR ALLOWANCE | 0.00 |
| | **PREDELIVERY FEE | 799.00 |
| APR         FINANCE CHARGE      TOT PAYMENTS | SUBTOTAL | 19,293.00 |
| 17.950%     8,227.38              23,989.20 | STATE SALES TAX      6.00% | 1,157.58 |
| THE BALANCE IS TO BE PAID IN 60.00 PAYMENTS OF $399.82 | COUNTY TAX         1.00% | 77.94 |
| DOLLARS,FIRST PAYMENT IS DUE ON 10/15/2005 AND MONTHLY | OTHER TAX         0.00% | 0.00 |
| 60.00 399.82 | TAG / XFER | 220.00 |
| PURCHASER (BUYER) AGREES THAT THIS ORDER INCLUDES ALL OF THE TERMS AND CONDITIONS HEREFORE, THAT THIS ORDER CANCELS AND SUPERCEDES | MVWFT/TIRE/BATTERY FEES | 0.00 |
| ANY PRIOR AGREEMENT WRITTEN OR VERBAL. PURCHASER AGREES TO PAY THE TOTAL OF PAYMENTS IN ACCORDANCE WITH THE PAYMENT SCHEDULE | INS. PREMIUM | 0.00 |
| SHOWN ABOVE. THIS ORDER SHALL NOT BECOME BINDING UNTIL ACCEPTED BY THE DEALER OR HIS OR HER AUTHORIZED REPRESENTATIVE. | GAP / CAR CLUB | 0.00 |
| NOTICE, DEALER PROVIDES NO INSURANCE BUYER AGREES TO FURNISH FULL COVERAGE INSURANCE | DOCUMENTARY STAMPS | 55.30 |
| [ ] I RELINQUISH ALL RIGHTS TO THIS VEHICLE AND IT CAN BE REPOSSESSED | MISC | 0.00 |
| AT ANY TIME OR PLACE, WITH OR WITHOUT MY KNOWLEDGE SHOULD THIS ACCOUNT BECOME DELIQUENT. | AMT. OWED ON TRADE | 0.00 |
| [ ] SOLD AS IS : MAKE THIS PURCHASE KNOWINGLY, WITHOUT ANY GUARANTEE. NEITHER EXPRESSED NOR IMPLIED, BY THIS DEALER OR HIS | SUBTOTAL | 20,803.82 |
| AGENT. I AGREE TO NOTIFY THE LIEN HOLDER, IF (A) CHANGE OF ADDRESS OCCURS (B) CHANGE OF EMPLOYMENT OCCURS. | PARTIAL DOWN | 5042.00 |
| ( ) ALL SALES FINAL. NO RETURNS NO REFUNDS | BALANCE OF DOWN | 0.00 |
| I HAVE READ THE FACE OF THIS ORDER AND AGREE TO THIS PURCHASE PRICE. I HEREBY CERTIFY THAT I AM 18 YEARS OF AGE OR OLDER. | TOTAL CASH DOWN   GRAND TOTAL | $5,042.00   $15,761.82 |

Trade:

LOURDES MURO                    9/15/05
                                DATE                                                    DATE

DEALERS AGENT                   DATE     LIEN TO:  CPS
** Note: PREDELIVERY FEE Represents cost and profit to the seller/dealer for the items such as inspecting, cleaning and adjusting the new and used vehicles as well as preparing documents related to the sale.

EXHIBIT
Plaintiffs 6
7-10-07 MJ

January 3, 2006


ATT:  Lourdes Muro
        7948 LaSalle Blvd
        Miramar, Fl 33023

        8847 NW 151 TER
        Miami Lakes, Fl 33018

RE:   2002 Jaguar X-Type
        SAJEA51C42WC31867


Mrs. Muro;

As you are aware we have taken possession of the above described vehicle for failure to pay the remaining balance as agreed. We ask that you come in so that we may help you obtain financing for the balance you owe us in accordance to the buyers order you signed on September 15, 2005. The balance according to the buyers order is $11,910.94. This amount does not include acquisitions fees which may or may not be charged by the finance company or the repossession fee. In addition, we would like to add, that we cannot guarantee you an interest rate at this point, since we do not know the status of your credit but we will do everything possible to help you obtain financing.

You may also pay the entire balance of $_____ to us which includes the $11,910.94 per buyers order and the repossession fee. Payment can be made via cashiers check or if you obtain your own financing, with a draft.

We are giving you a total of 10 working days from receipt of this notice to contact us at (305) 685-1717 so we may know what your decision is. Failure to contact us will give us the indication that you do not want the vehicle and you are forfeiting the amount of down payment given to The Car Shack.

Once again, we ask that you contact us immediately.


Sincerely;


Ernesto Sanchez
THE CAR SHACK


# A



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

7004 2890 0004 0160 7758

Sent To _Lourdes Muro_
Street, Apt. No., or PO Box No. _8847 NW 157teer_
City, State, ZIP+4 _Miami Lakes Fc 33018_

PS Form 3800, June 2002                    See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

7004 2890 0160 7741

Sent To _Lourdes Muro_
Street, Apt. No., or PO Box No. _7948 LaSalle Blvd_
City, State, ZIP+4 _Miramar Fl 33023_

PS Form 3800, June 2002                    See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

_Lourdes Muro_
_7948 LaSalle Blvd_
_Miramar, Fl 33023_

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _E A Terley_          ☐ Agent
                        ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
_EDWARD TERBO_  _1-11-06_

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☒ Certified Mail      ☐ Express Mail
   ☐ Registered          ☒ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

2. Article Number
   (Transfer from service label)    _7004 2890 0004 0160 7741_

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

January 3, 2006

ATT:   Lourdes Muro
       7948 LaSalle Blvd
       Miramar, Fl 33023

       8847 NW 151 TER
       Miami Lakes, Fl 33018

RE:    2002 Jaguar X-Type
       SAJEA51C42WC31867

Mrs. Muro;

As you are aware we have taken possession of the above described vehicle for failure to pay the remaining balance as agreed. We ask that you come in so that we may help you obtain financing for the balance you owe us in accordance to the buyers order you signed on September 15, 2005. The balance according to the buyers order is $11,910.94. This amount does not include acquisitions fees which may or may not be charged by the finance company or the repossession fee. In addition, we would like to add, that we cannot guarantee you an interest rate at this point, since we do not know the status of your credit but we will do everything possible to help you obtain financing.

You may also pay the entire balance of $_____ to us which includes the $11,910.94 per buyers order and the repossession fee. Payment can be made via cashiers check or if you obtain your own financing, with a draft.

We are giving you a total of 10 working days from receipt of this notice to contact us at (305) 685-1717 so we may know what your decision is. Failure to contact us will give us the indication that you do not want the vehicle and you are forfeiting the amount of down payment given to The Car Shack.

Once again, we ask that you contact us immediately.

Sincerely;

Ernesto Sanchez
THE CAR SHACK

# A

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To *Lourdes Muro*
Street, Apt. No.; or PO Box No. *8847 NW 157 Terr*
City, State, ZIP+4 *Miami Lakes FL 33018*

PS Form 3800, June 2002          See Reverse for Instructions

7004 2890 0004 0160 7758

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To *Lourdes Muro*
Street, Apt. No.; or PO Box No. *7948 La Salle Blvd*
City, State, ZIP+4 *Miramar Fl 33023*

PS Form 3800, June 2002          See Reverse for Instructions

7004 2890 0004 0160 7741

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Lourdes Muro*
*7948 La Salle Blvd*
*Miramar, Fl 33023*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *EA Terley*       ☐ Agent   ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
*EDWARD TERBOL*  1-11-06

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered       ☒ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7004 2890 0004 0160 7741

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

**553-FL 10/04**  68015

Ptg. 7/05

**EXHIBIT**
Plaintiff's B
7-10-07 M81

## RETAIL INSTALLMENT SALE CONTRACT
### SIMPLE FINANCE CHARGE

Dealer Number _____     Contract Number _____

| Buyer (and Co-Buyer) Name and Address (Including County and Zip Code) | Creditor - Seller (Name and Address) |
|---|---|
| LOURDES LAURO | "THE CAR SHACK" |
| 7943 LASALLE BLVD | 920 EAST 49 ST |
| MIRAMAR FL 33023 | HIALEAH      FL      33013 |
| Buyer's Month of Birth:  February | |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis at the Base Rate of 17.95 % per year. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Weight (lbs.) | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| USED | 2002 | JAGUAR X-TYPE | | SAJEA51C42WC31807 | ☒ personal, family or household<br>☐ business<br>☐ agricultural |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE. The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $5042.00 is |
|---|---|---|---|---|
| 17.95 % | $ 8,227.15 | $ 13,762.05 | $ 23,989.20 | $ 29,031.20 |

**Insurance.** You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below. Your decision to buy or not buy other insurance will not be a factor in the credit approval process. Your choice of insurance providers will not affect our decision to sell you the vehicle or extend credit to you.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 60 | 399.82 | Monthly beginning 10/13/2005 |
| Or As Follows: | | |

**Late Charge.** If payment is not received in full within 10 days after it is due, you will pay a late charge of 5 % of the part of the payment that is late.

**Prepayment.** If you pay off all your debt early, you may have to pay a penalty.

**Security Interest.** You are giving a security interest in the vehicle being purchased.

**Additional Information:** See this contract for more information including information about nonpayment, default, prepayment penalties, any required repayment in full before the scheduled date and security interest.

#### Check the insurance you want and sign below:
**Optional Credit Insurance**
☐ Credit Life:  ☐ Buyer  ☐ Co-Buyer  ☐ Both

Term _____

☐ Credit Disability (Buyer Only)

Term _____

Premium:

Credit Life $ _____ N/A _____

Credit Disability $ _____ N/A _____

Insurance Company Name _____

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not to buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments.

If the box above is checked to indicate that you want credit life insurance, please read and sign the following acknowledgments:
1. You understand that you have the option of assigning any other policy or policies you own or may procure for the purpose of covering this extension of credit and that this policy need not be purchased in order to obtain the extension of credit.

X _____     _____
Buyer                               Date

X _____     _____
Co-Buyer                         Date

2. You understand that the credit life coverage may be

### ITEMIZATION OF AMOUNT FINANCED

1  Cash Price (including $ 1,041.25 sales tax)     $ 12,528.75  (1)

2  Total Downpayment =

Trade-In  1997 JEEP GRAND CHEROKEE
              (Year)      (Make)              (Model)

Trade-In  1J4FX58S7VC619414
              (VIN)

Gross Trade-In Allowance                         $ 3,300.00
Less Pay Off Made By Seller                       $ 3,300.00
Equals Net Trade In                                    $ 0.00
+ Cash                                                     $ 5,042.00
+ Other                                                    $ N/A

(If total downpayment is negative, enter "0" and see 4I below)     $ 5,042.00  (2)

3  Unpaid Balance of Cash Price (1 minus 2)     $ 11,486.75  (3)

4  Other Charges Including Amounts Paid to Others on Your Behalf
    (Seller may keep part of these amounts):

    A  Cost of Optional Credit Insurance Paid to Insurance
        Company or Companies.

Company of Companies.

| | Life | $ | N/A |
| | Disability | $ | N/A |
| B | Vendor's Single Interest Insurance Paid to Insurance Company | $ | N/A |
| C | Other Insurance Paid to Insurance Company or Companies | $ | N/A |
| D | Official Fees Paid to Government Agencies | $ | N/A |
| E | Government Documentary Stamp Taxes | $ | N/A |
| F | Government Taxes Not Included in Cash Price | $ | 200.00 |
| G | Government License and/or Registration Fees | $ | N/A |
| | | $ | N/A |
| H | Government Certificate of Title Fees | $ | N/A |
| I | Other Charges (Seller must identify who is paid and describe purpose) | | |

| to | | for Prior Credit or Lease Balance | $ | N/A |
| EXTENDED CARE P | Extended Serv. Plan | $ | 2,000.00 |
| to | | for | $ | N/A |
| to | | for | $ | N/A |
| to | | for | N/A | $ | N/A |
| to | | for | $ | N/A |
| to | | for | $ | N/A |

Total Other Charges and Amounts Paid to Others on Your Behalf  $ 2,275.30 (4)

5 Loan Processing Fee Paid to Seller (Prepaid Finance Charge)  $ 0.00 (5)

6 Amount Financed (3 plus 4)  $ 15,763.05 (6)

Payment Schedule: 60 installments of $ 300.62 each, monthly beginning _____ or as follows

2. You understand that the credit life coverage may be deferred if, at the time of application, you are unable to engage in employment or unable to perform normal activities of a person of like age and sex. (You need not sign this acknowledgement if the proposed credit life insurance policy does not contain this restriction.)

X _____  
Buyer                    Date

X _____  
Co-Buyer                 Date

3. You understand that the benefits under the policy will terminate when you reach a certain age and affirm that your age is accurately represented on the application or policy.

X _____  
Buyer                    Date

X _____  
Co-Buyer          N/A    Date

### Other Insurance

☐ _____  
Type of Insurance        Term

Premium $ _____

Insurance Company Name

Home Office Address

I want the insurance checked above.

X _____  
Buyer Signature          Date

X _____  
Co-Buyer Signature       Date

**LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED IN THIS CONTRACT.**

☐ **VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance):** If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. **You may choose the insurance company through which the VSI insurance is obtained.** If you elect to purchase VSI insurance through the Creditor, **the cost of this insurance is $** _____ and is also shown in Item 4B of the ITEMIZATION OF AMOUNT FINANCED. The coverage is for the initial term of the contract. "You authorize us to purchase Vendor's or Lender's Single Interest Insurance.

Buyer: _____ Co-Buyer: _____ Date: _____

Returned Check Charge: If any check or order of payment you give us is dishonored, you will pay a charge if we make demand that you do so. The charge will be $25 if the check amount is $50 or less; $30 if the check is over $50 but not more than $300; $40 if the check amount is over $300, or such amount as permitted by law.

OPTION: ☐ You pay no finance charge if the amount financed, item 6, is paid in full on or before _____ Year _____ SELLERS INITIALS _____

## NO COOLING OFF PERIOD
**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.  Buyer Signs X _____  Co-Buyer Signs X _____

If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

See back for other important agreements.

**NOTICE TO THE BUYER: a)** Do not sign this contract before you read it or if it contains any blank spaces. **b)** You are entitled to an exact copy of the contract you sign. Keep it to protect your legal rights.

You agree to the terms of this contract. You confirm that before you signed it, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it.

Buyer Signs X _____ Date _____  Co-Buyer Signs X _____ Date _____

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here  X _____  Address _____

Other Charges: (Seller must identify who is paid and
describe purpose)

| to | for Prior Credit or Lease Balance | $ |  |
| to | for | $ |  |
| to | for | $ |  |
| to | for | $ |  |
| to | for | $ |  |
| to | for | $ |  |

Total Other Charges and Amounts Paid to Others on Your Behalf $    (4)

5   Loan Processing Fee Paid to Seller (Prepaid Finance Charge)   $   (5)

6   Amount Financed (3 plus 4)   $   (6)

Payment Schedule: _____ installments of $ _____ each, monthly beginning _____
or as follows

... is accurately represented on the application or policy.

X _____
Buyer      Date

X _____
Co-Buyer      Date

### Other Insurance

☐ _____
Type of Insurance    Term

Premium $ _____

Insurance Company Name _____

Home Office Address _____

I want the insurance checked above.

X _____
Buyer Signature      Date

X _____
Co-Buyer Signature      Date

**LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED IN THIS CONTRACT.**

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. **You may choose the insurance company through which the VSI insurance is obtained.** If you elect to purchase VSI insurance through the Creditor, **the cost of this insurance is** $ _____ and is also shown in Item 4B of the ITEMIZATION OF AMOUNT FINANCED. The coverage is for the initial term of the contract.
"You authorize us to purchase Vendor's or Lender's Single Interest Insurance.

Buyer: _____ Co-Buyer: _____ Date: _____ "

**Returned Check Charge:** If any check or order of payment you give us is dishonored, you will pay a charge if we make demand that you do so. The charge will be $25 if the check amount is $50 or less; $30 if the check is over $50 but not more than $300; $40 if the check amount is over $300, or such amount as permitted by law.

**OPTION:** ☐ You pay no finance charge if the amount financed, item 6, is paid in full on or before _____, Year _____ SELLERS INITIALS

## NO COOLING OFF PERIOD

**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding. Buyer Signs X _____ Co-Buyer Signs X _____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.
**See back for other important agreements.**
**NOTICE TO THE BUYER: a) Do not sign this contract before you read it or if it contains any blank spaces. b) You are entitled to an exact copy of the contract you sign. Keep it to protect your legal rights.**

**You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it.**

Buyer Signs X _____ Date _____ Co-Buyer Signs X _____ Date _____

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X _____
Seller signs _____ Date _____ By X _____ Title _____
Address _____

Seller assigns its interest in this contract to _____ (Assignee) under the terms of Seller's agreement(s) with Assignee.

| ☐ Assigned with recourse | ☒ Assigned without recourse | ☐ Assigned with limited recourse |
| Seller | By | Title |

FORM NO. 553-FL (REV. 1994) U.S. PATENT NO. D460,782
©2004 Reynolds and Reynolds TO ORDER: www.reysource.com; 1-800-344-0996; fax 1-800-531-9055
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

CUSTOMER / TRUTH IN LENDING COPY

## OTHER IMPORTANT AGREEMENTS

1. **FINANCE CHARGE AND PAYMENTS**

    a. **How we will figure Finance Charge.** We will treat any Prepaid Finance Charge as fully earned on the date of this contract. We will figure the rest of the finance charge on a daily basis at the Base Rate on the unpaid part of your Principal Balance. Your Principal Balance is the sum of the Amount Financed and the Prepaid Finance Charge, if any.

    b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of your Principal Balance and to other amounts you owe under this contract in any order we choose.

    c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

    d. **You may prepay.** You may prepay all or part of your Principal Balance at any time. If the contract is paid in full within six months after the date you sign it, we may impose an acquisition charge, not exceeding $75, for services performed on your behalf for processing this contract. If you prepay, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

    e. **You may ask for a payment extension.** You may ask us for a deferral of the scheduled due date of all or any part of a payment (extension). If we agree to your request, we may charge you a $15 extension fee. You must maintain the physical damage insurance required by this contract (see below) during any extension. If you do not have this insurance, we may buy it and charge you for it as this contract says. You may extend the term of any optional insurance you bought with this contract to cover the extension if the insurance company or your insurance contract permits it, and you pay the charge for extending this insurance.

    If you get a payment extension, you will pay additional finance charges at the Base Rate on the amount extended during the extension. You will also pay any additional insurance charges resulting from the extension, and the $15 extension fee if we charge you this fee.

2. **YOUR OTHER PROMISES TO US**

    a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

    b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to

If you pay late, we may also take the steps described below.

    b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once. Default means:
    • You do not pay any payment on time;
    • You start a proceeding in bankruptcy or one is started against you or your property; or
    • You break any agreements in this contract.
    The amount you will owe will be the unpaid part of your Principal Balance plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

    c. **You may have to pay collection costs.** If we hire an attorney to collect what you owe, you will pay the attorney's fee and court costs as permitted by law. This includes any attorneys' fees we incur as a result of any bankruptcy proceeding brought by or against you under federal law.

    d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

    e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

    f. **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

    We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

    g. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. **WARRANTIES SELLER DISCLAIMS**

expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

c.   **Security Interest.**
You give us a security interest in:
- The vehicle and all parts or goods put on it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

d.   **Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium of the insurance and a finance charge at the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

e.   **What happens to returned insurance, maintenance, service, or other contract charges.** If we obtain a refund on insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3.   **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**
a.   **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

4.   **WARRANTIES SELLER DISCLAIMS**
Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.
This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

5.   **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
**Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

6.   **Optional Service Contracts.**
You are not required to buy a service contract to obtain credit. Your choice of service contract providers for any service contracts you buy will not affect our decision to sell or extend credit to you.

7.   **Rejection or Revocation.**
If you are permitted under Florida's Uniform Commercial Code to reject or revoke acceptance of the vehicle and you claim a security interest in the vehicle because of this, you must either: (a) post a bond in the amount of the disputed balance; or (b) deposit all installment payments as they become due into the registry of a court of competent jurisdiction.

8.   **Applicable Law**
Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Form No. 553-FL 10/04

- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

   d. **Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium of the insurance and a finance charge at the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

   e. **What happens to returned insurance, maintenance, service, or other contract charges.** If we obtain a refund on insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

   a. **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

5. **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
Spanish Translation: **Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

6. **Optional Service Contracts.**
You are not required to buy a service contract to obtain credit. Your choice of service contract providers for any service contracts you buy will not affect our decision to sell or extend credit to you.

7. **Rejection or Revocation.**
If you are permitted under Florida's Uniform Commercial Code to reject or revoke acceptance of the vehicle and you claim a security interest in the vehicle because of this, you must either: (a) post a bond in the amount of the disputed balance; or (b) deposit all installment payments as they become due into the registry of a court of competent jurisdiction.

8. **Applicable Law**
Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

---

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Form No. 553-FL 10/04